# ENMUND v. FLORIDA

No. 81–5321.   Argued March 23, 1982—Decided July 2, 1982

WHITE, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. BRENNAN, J., filed a concurring opinion, *post*, p. 801. O'CONNOR, J., filed a dissenting opinion, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined, *post*, p. 801.

*James S. Liebman* argued the cause *pro hac vice* for petitioner. With him on the briefs were *William C. McLain, Jack Greenberg, James M. Nabrit III, Joel Berger, John Charles Boger, Deborah Fins*, and *Anthony G. Amsterdam*.

*Lawrence A. Kaden*, Assistant Attorney General of Florida, argued the cause *pro hac vice* for respondent. With him on the brief were *Jim Smith*, Attorney General, and *George R. Georgieff* and *Raymond L. Marky*, Assistant Attorneys General.*

JUSTICE WHITE delivered the opinion of the Court.

## I

The facts of this case, taken principally from the opinion of the Florida Supreme Court, are as follows. On April 1,

---

*\*Daniel J. Popeo, Paul D. Kamenar*, and *Nicholas E. Calio* filed a brief for the Washington Legal Foundation as *amicus curiae* urging affirmance.

*Robert K. Corbin*, Attorney General of Arizona, *William J. Schaffer III*, and *Bruce Ferg*, Assistant Attorneys General, filed a brief for the States of Arizona et al. as *amici curiae*.

1975, at approximately 7:45 a. m., Thomas and Eunice Kersey, aged 86 and 74, were robbed and fatally shot at their farmhouse in central Florida. The evidence showed that Sampson and Jeanette Armstrong had gone to the back door of the Kersey house and asked for water for an overheated car. When Mr. Kersey came out of the house, Sampson Armstrong grabbed him, pointed a gun at him, and told Jeanette Armstrong to take his money. Mr. Kersey cried for help, and his wife came out of the house with a gun and shot Jeanette Armstrong, wounding her. Sampson Armstrong, and perhaps Jeanette Armstrong, then shot and killed both of the Kerseys, dragged them into the kitchen, and took their money and fled.

Two witnesses testified that they drove past the Kersey house between 7:30 and 7:40 a. m. and saw a large cream- or yellow-colored car parked beside the road about 200 yards from the house and that a man was sitting in the car. Another witness testified that at approximately 6:45 a. m. he saw Ida Jean Shaw, petitioner's common-law wife and Jeanette Armstrong's mother, driving a yellow Buick with a vinyl top which belonged to her and petitioner Earl Enmund. Enmund was a passenger in the car along with an unidentified woman. At about 8 a. m. the same witness saw the car return at a high rate of speed. Enmund was driving, Ida Jean Shaw was in the front seat, and one of the other two people in the car was lying down across the back seat.

Enmund, Sampson Armstrong, and Jeanette Armstrong were indicted for the first-degree murder and robbery of the Kerseys. Enmund and Sampson Armstrong were tried together.[1] The prosecutor maintained in his closing argument that "Sampson Armstrong killed the old people." Record 1577. The judge instructed the jury that "[t]he killing of a

---

[1] Jeanette Armstrong's trial was severed and she was convicted of two counts of second-degree murder and one count of robbery and sentenced to three consecutive life sentences. 399 So. 2d 1362, 1371 (Fla. 1981).

human being while engaged in the perpetration of or in the attempt to perpetrate the offense of robbery is murder in the first degree even though there is no premeditated design or intent to kill." App. 6. He went on to instruct them that

> "[i]n order to sustain a conviction of first degree murder while engaging in the perpetration of or in the attempted perpetration of the crime of robbery, the evidence must establish beyond a reasonable doubt that the defendant was actually present and was actively aiding and abetting the robbery or attempted robbery, and that the unlawful killing occurred in the perpetration of or in the attempted perpetration of the robbery." *Id.*, at 9.

The jury found both Enmund and Sampson Armstrong guilty of two counts of first-degree murder and one count of robbery. A separate sentencing hearing was held and the jury recommended the death penalty for both defendants under the Florida procedure whereby the jury advises the trial judge whether to impose the death penalty. See Fla. Stat. § 921.141(2) (1981). The trial judge then sentenced Enmund to death on the two counts of first-degree murder. Enmund appealed, and the Florida Supreme Court remanded for written findings as required by Fla. Stat. § 921.141(3) (1981). The trial judge found four statutory aggravating circumstances: the capital felony was committed while Enmund was engaged in or was an accomplice in the commission of an armed robbery, Fla. Stat. § 921.141(5)(d) (1981); the capital felony was committed for pecuniary gain, § 921.141(5)(f); it was especially heinous, atrocious, or cruel, § 921.141(5)(h); and Enmund was previously convicted of a felony involving the use or threat of violence, § 921.141(5)(b). 399 So. 2d 1362, 1371–1372 (Fla. 1981). The court found that *"none* of the statutory mitigating circumstances applied" to Enmund and that the aggravating circumstances outweighed the mitigating circumstances. *Id.*, at 1372. Enmund was therefore sentenced to death on each of the murder counts.

The Florida Supreme Court affirmed Enmund's conviction and sentences. It found that "[t]here was no direct evidence at trial that Earl Enmund was present at the back door of the Kersey home when the plan to rob the elderly couple led to their being murdered." *Id.*, at 1370. However, it rejected petitioner's argument that at most he could be found guilty of second-degree murder under Florida's felony-murder rule. The court explained that the interaction of the "'felony murder rule and the law of principals combine to make a felon generally responsible for the lethal acts of his co-felon.'" *Id.*, at 1369, quoting *Adams* v. *State*, 341 So. 2d 765, 768–769 (Fla. 1976), cert. denied, 434 U. S. 878 (1977). Although petitioner could be convicted of second-degree murder only if he were an accessory before the fact rather than a principal, the Florida Supreme Court reasoned:

> "[T]he only evidence of the degree of his participation is the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes. The jury could have concluded that he was there, a few hundred feet away, waiting to help the robbers escape with the Kerseys' money. The evidence, therefore, was sufficient to find that the appellant was a principal of the second degree, constructively present aiding and abetting the commission of the crime of robbery. This conclusion supports the verdicts of murder in the first degree on the basis of the felony murder portion of section 782.04(1)(a)." 399 So. 2d, at 1370.[2]

---

[2] The Florida Supreme Court's understanding of the evidence differed sharply from that of the trial court with respect to the degree of Enmund's participation. In its sentencing findings, the trial court concluded that Enmund was a major participant in the robbery because he planned the robbery in advance and himself shot the Kerseys. 399 So. 2d, at 1372. Both of these findings, as we understand it, were rejected by the Florida Supreme Court's holding that the only supportable inference with respect to Enmund's participation was that he drove the getaway car. The dissent, while conceding that this holding negated the finding that Enmund

The State Supreme Court rejected two of the four statutory aggravating circumstances found by the trial court. It held that the findings that the murders were committed in the course of a robbery and that they were committed for pecuniary gain referred to the same aspect of petitioner's crime and must be treated as only one aggravating circumstance. *Id.*, at 1373. In addition, the court held that "[t]he recited circumstance, that the murders were especially heinous, atrocious, and cruel, cannot be approved." *Ibid.*, citing *Armstrong* v. *State*, 399 So. 2d 953 (Fla. 1981).[3] However, because there were two aggravating circumstances and no mitigating circumstances, the death sentence was affirmed. In so doing, the court expressly rejected Enmund's submission that because the evidence did not establish that he intended to take life, the death penalty was barred by the Eighth Amendment of the United States Constitution. 399 So. 2d, at 1371.

We granted Enmund's petition for certiorari, 454 U. S. 939 (1981), presenting the question whether death is a valid penalty under the Eighth and Fourteenth Amendments for one who neither took life, attempted to take life, nor intended to take life.[4]

---

was one of the triggermen, argues that the trial court's finding that Enmund planned the robbery was implicitly affirmed. *Post*, at 809. As we have said, we disagree with that view. In any event, the question is irrelevant to the constitutional issue before us, since the Florida Supreme Court held that driving the escape car was enough to warrant conviction and the death penalty, whether or not Enmund intended that life be taken or anticipated that lethal force would be used.

[3] In *Armstrong* the Florida Supreme Court rejected the trial court's conclusion that the Kerseys had been killed in order to eliminate them as witnesses, and stated that according to the only direct account of the events, "the shootings were indeed spontaneous and were precipitated by the armed resistance of Mrs. Kersey." 399 So. 2d, at 963.

[4] The petitioner argues a second question: whether the degree of Enmund's participation in the killings was given the consideration required by the Eighth and Fourteenth Amendments. We need not deal with this question.

## II

As recounted above, the Florida Supreme Court held that the record supported no more than the inference that Enmund was the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape. This was enough under Florida law to make Enmund a constructive aider and abettor and hence a principal in first-degree murder upon whom the death penalty could be imposed. It was thus irrelevant to Enmund's challenge to the death sentence that he did not himself kill and was not present at the killings; also beside the point was whether he intended that the Kerseys be killed or anticipated that lethal force would or might be used if necessary to effectuate the robbery or a safe escape. We have concluded that imposition of the death penalty in these circumstances is inconsistent with the Eighth and Fourteenth Amendments.

### A

The Cruel and Unusual Punishments Clause of the Eighth Amendment is directed, in part, "'against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged.'" *Weems* v. *United States*, 217 U. S. 349, 371 (1910), quoting *O'Neil* v. *Vermont*, 144 U. S. 323, 339–340 (1892) (Field, J., dissenting). This Court most recently held a punishment excessive in relation to the crime charged in *Coker* v. *Georgia*, 433 U. S. 584 (1977). There the plurality opinion concluded that the imposition of the death penalty for the rape of an adult woman "is grossly disproportionate and excessive punishment for the crime of rape and is therefore forbidden by the Eighth Amendment as cruel and unusual punishment." *Id.*, at 592. In reaching this conclusion, it was stressed that our judgment "should be informed by objective factors to the maximum possible extent." *Ibid.* Accordingly, the Court looked to the historical development of the punishment at issue, legislative judgments, international opinion, and the sentencing decisions juries have made before bringing its

own judgment to bear on the matter. We proceed to analyze the punishment at issue in this case in a similar manner.

B

The *Coker* plurality observed that "[a]t no time in the last 50 years have a majority of the States authorized death as a punishment for rape." *Id.*, at 593. More importantly, in reenacting death penalty laws in order to satisfy the criteria established in *Furman* v. *Georgia*, 408 U. S. 238 (1972), only three States provided the death penalty for the rape of an adult woman in their revised statutes. 433 U. S., at 594. The plurality therefore concluded that "[t]he current judgment with respect to the death penalty for rape is not wholly unanimous among state legislatures, but it obviously weighs very heavily on the side of rejecting capital punishment as a suitable penalty for raping an adult woman." *Id.*, at 596 (footnote omitted).

Thirty-six state and federal jurisdictions presently authorize the death penalty. Of these, only eight jurisdictions authorize imposition of the death penalty solely for participation in a robbery in which another robber takes life.[5] Of the remaining 28 jurisdictions, in 4 felony murder is not a capital crime.[6] Eleven States require some culpable mental state

---

[5] Cal. Penal Code Ann. §§ 189, 190.2(a)(17) (West Supp. 1982); Fla. Stat. §§ 782.04(1)(a), 775.082(1), 921.141(5)(d) (1981); Ga. Code §§ 26–1101(b), (c), 27–2534.1(b)(2) (1978); Miss. Code Ann. §§ 97–3–19(2)(e), 99–19–101(5)(d) (Supp. 1981); Nev. Rev. Stat. §§ 200.030(1)(b), 200.030(4), 200.033(4) (1981); S. C. Code §§ 16–3–10, 16–3–20(C)(a)(1) (1976 and Supp. 1981); Tenn. Code Ann. §§ 39–2402(a), 39–2404(i)(7) (Supp. 1981); Wyo. Stat. §§ 6–4–101, 6–4–102(h)(iv) (1977).

[6] Mo. Rev. Stat. §§ 565.001, 565.003, 565.008(2) (1978) (death penalty may be imposed only for capital murder; felony murder is first-degree murder); N. H. Rev. Stat. Ann. §§ 630:1, 630:1(III), 630:1–a(I)(b)(2) (1974 and Supp. 1981) (capital murder includes only killing a law enforcement officer, killing during a kidnaping, and murder for hire); 18 Pa. Cons. Stat. §§ 2502(a), (b), 1102 (1980) (death penalty may be imposed only for first-degree murder; felony murder is second-degree murder); Wash. Rev. Code §§ 9A.32.030, 10.95.020 (1981) (death penalty may be imposed only for premeditated killing).

with respect to the homicide as a prerequisite to conviction of a crime for which the death penalty is authorized. Of these 11 States, 8 make knowing, intentional, purposeful, or premeditated killing an element of capital murder.[7] Three other States require proof of a culpable mental state short of intent, such as recklessness or extreme indifference to human life, before the death penalty may be imposed.[8] In these 11 States, therefore, the actors in a felony murder are not subject to the death penalty without proof of their mental state, proof which was not required with respect to Enmund

---

[7] Ala. Code §§ 13A–2–23, 13A–5–40(a)(2), 13A–6–2(a)(1) (1977 and Supp. 1982) (to be found guilty of capital murder, accomplice must have had "intent to promote or assist the commission of the offense" and murder must be intentional); Ill. Rev. Stat., ch. 38, ¶¶ 9–1(a)(3), 9–1(b)(6) (1979) (capital crime only if defendant killed intentionally or with knowledge that his actions "created a strong probability of death or great bodily harm"); La. Rev. Stat. Ann. § 14:30(1) (West Supp. 1982) ("specific intent to kill"); N. M. Stat. Ann. §§ 30–2–1(A)(2), 31–18–14(A), 31–20A–5 (Supp. 1981) (felony murder is a capital crime but death penalty may not be imposed absent intent to kill unless victim was a peace officer); Ohio Rev. Code Ann. §§ 2903.01(B), (C), (D), 2929.02(A), 2929.04(A)(7) (1982) (accomplice not guilty of capital murder unless he intended to kill); Tex. Penal Code Ann. §§ 19.02(a), 19.03(a)(2) (1974) ("intentionally commits the murder in the course of [a felony]"); Utah Code Ann. § 76–5–202(1) (1978) ("intentionally or knowingly causes the death of another"); Va. Code § 18.2–31(d) (1982) ("willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon").

[8] Ark. Stat. Ann. § 41–1501(1)(a) (1977) ("extreme indifference to . . . life"); see also § 41–1501, Commentary ("an inadvertent killing in the course of a felony will not . . . support . . . a conviction entailing punishment by death"); Del. Code Ann., Tit. 11, §§ 636(a)(2), (6) (1979) ("recklessly" or "with criminal negligence" causes death during the commission of a felony); Ky. Rev. Stat. § 507.020(1)(b) (Supp. 1980) (defendant must manifest "extreme indifference to human life" and "wantonly engag[e] in conduct which creates a grave risk of death . . . and thereby causes . . . death"); see also Commentary following Criminal Law of Kentucky Annotated, Penal Code § 507.020, p. 677 (1978) (each accomplice's "participation in [the] felony" must "constitut[e] wantonness manifesting extreme indifference to human life").

either under the trial court's instructions or under the law announced by the Florida Supreme Court.

Four additional jurisdictions do not permit a defendant such as Enmund to be put to death. Of these, one State flatly prohibits capital punishment in cases where the defendant did not actually commit murder.[9] Two jurisdictions preclude the death penalty in cases such as this one where the defendant "was a principal in the offense, which was committed by another, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution."[10] One other State limits the death penalty in felony murders to narrow circumstances not involved here.[11]

Nine of the remaining States deal with the imposition of the death penalty for a vicarious felony murder in their capital sentencing statutes. In each of these States, a defendant may not be executed *solely* for participating in a felony in which a person was killed if the defendant did not actually cause the victim's death. For a defendant to be executed in these States, typically the statutory aggravating circumstances which are present must outweigh mitigating factors. To be sure, a vicarious felony murderer may be sentenced to death in these jurisdictions absent an intent to kill if sufficient aggravating circumstances are present. However, six

---

[9] Md. Code Ann., Art. 27, §§ 410, 412(b), 413(d)(10), 413(e)(1) (1982) (except in cases of murder for hire, only principal in the first degree subject to the death penalty). In addition, two jurisdictions already accounted for in n. 7, *supra*, also preclude the death penalty where the defendant did not commit the murder. Ill. Rev. Stat., ch. 38, ¶¶ 9–1(a)(3), 9–1(b)(6) (1979) (defendant must actually kill victim); Va. Code §§ 18.2–31(d), 18.2–10(a), 18.2–18 (1982) (except in cases of murder for hire, only principal in the first degree may be tried for capital murder).

[10] Colo. Rev. Stat. § 16–11–103(5)(d) (1978); 49 U. S. C. § 1473(c)(6)(D) (same).

[11] Vt. Stat. Ann., Tit. 13, §§ 2303(b), (c) (Supp. 1981) (capital murder reserved for offenders who commit a second unrelated murder or murder of a correctional officer).

of these nine States make it a statutory *mitigating* circumstance that the defendant was an accomplice in a capital felony committed by another person and his participation was relatively minor.[12] By making minimal participation in a capital felony committed by another person a mitigating circumstance, these sentencing statutes reduce the likelihood that a person will be executed for vicarious felony murder. The remaining three jurisdictions exclude felony murder from their lists of aggravating circumstances that will support a death sentence.[13] In each of these nine States, a nontriggerman guilty of felony murder cannot be sentenced to death for the felony murder absent aggravating circumstances above and beyond the felony murder itself.

Thus only a small minority of jurisdictions—eight—allow the death penalty to be imposed solely because the defendant somehow participated in a robbery in the course of which a murder was committed. Even if the nine States are included where such a defendant could be executed for an unintended felony murder if sufficient aggravating circumstances are present to outweigh mitigating circumstances—which often include the defendant's minimal participation in the murder—only about a third of American jurisdictions would ever permit a defendant who somehow participated in a robbery where a murder occurred to be sentenced to die. Moreover, of the eight States which have enacted new death penalty statutes since 1978, none authorize capital punishment in such circumstances.[14] While the current legislative judg-

---

[12] Ariz. Rev. Stat. Ann. § 13–703(G)(3) (Supp. 1981–1982) ("relatively minor" participation); Conn. Gen. Stat. § 53a–46a(f)(4) (Supp. 1982) (same); Ind. Code § 35–50–2–9(c)(4) (Supp. 1981) (same); Mont. Code Ann. § 46–18–304(6) (1981) (same); Neb. Rev. Stat. § 29–2523(2)(e) (1979) (same); N. C. Gen. Stat. § 15A–2000(f)(4) (Supp. 1981) (same).

[13] Idaho Code § 19–2515(f) (1979); Okla. Stat., Tit. 21, § 701.12 (1981); S. D. Comp. Laws Ann. § 23A–27A–1 (Supp. 1981).

[14] See the Ala., Colo., Conn., Md., Ohio, Pa., S. D., and Wash. statutes cited in nn. 5–7, 9, 10, 12, and 13, *supra*.

ment with respect to imposition of the death penalty where a defendant did not take life, attempt to take it, or intend to take life is neither "wholly unanimous among state legislatures," *Coker* v. *Georgia*, 433 U. S., at 596, nor as compelling as the legislative judgments considered in *Coker*, it nevertheless weighs on the side of rejecting capital punishment for the crime at issue.[15]

---

[15] The dissent characterizes the state statutes somewhat differently. It begins by noting that 31 States "authorize a sentencer to impose a death sentence for a death that occurs during the course of a robbery." *Post*, at 819. That is not relevant to this case, however. Rather, at issue is the number of States which authorize the death penalty where the defendant did not kill, attempt to kill, or intend to kill. The dissent divides the statutes into three categories. Its first category of 20 statutes include 8 about which there is no disagreement—Cal., Fla., Ga., Miss., Nev., S. C., Tenn., and Wyo. In 11 other States listed by the dissent—Ariz., Colo., Conn., Idaho, Ind., Mont., Neb., N. M., N. C., Okla., and S. D.—the dissent looks solely at the provisions defining the *crime* of capital murder. Colorado's capital sentencing statute makes a defendant's minimal participation in a murder an absolute defense to imposition of the death penalty. See n. 10, *supra*. Contrary to the dissent's claim that this provision would have been of no help to petitioner, see *post*, at 820, n. 36, if the case is judged on the basis of the Florida Supreme Court's findings, see n. 2, *supra*, Colorado law may well have barred imposition of the death penalty in this case. Similarly, the Ariz., Conn., Ind., Mont., Neb., and N. C. capital sentencing statutes do not permit capital punishment solely for vicarious felony murder and reduce the likelihood that the death penalty will be imposed on a vicarious felony murderer, even where aggravating circumstances are present, by making a defendant's minimal participation in the homicide a mitigating circumstance. See n. 12, *supra*. Three other States—Idaho, Okla., and S. D.—allow a defendant who does not intend to kill or actually kill to be executed only where other aggravating circumstances are present, and in those States the felony murder itself cannot serve as an aggravating circumstance. See n. 13, *supra*. New Mexico's capital sentencing statute requires the jury to find at least one statutory aggravating circumstance before the death penalty may be imposed, and in addition aggravating circumstances must outweigh mitigating circumstances. N. M. Stat. Ann. §§ 31–20A–4(C)(1) and (2) (Supp. 1981). The statute lists seven statutory aggravating circumstances, six of which require an intent to kill. §§ 31–20A–5(B)–(G). The only aggravating circumstance which does not

## C

Society's rejection of the death penalty for accomplice liability in felony murders is also indicated by the sentencing decisions that juries have made. As we have previously observed, "'[t]he jury . . . is a significant and reliable objective index of contemporary values because it is so directly involved.'" *Coker* v. *Georgia, supra,* at 596, quoting *Gregg* v. *Georgia,* 428 U. S. 153, 181 (1976). The evidence is overwhelming that American juries have repudiated imposition of the death penalty for crimes such as petitioner's. First, according to the petitioner, a search of all reported appellate court decisions since 1954 in cases where a defendant was executed for homicide shows that of the 362 executions, in 339 the person executed personally committed a homicidal assault.[16] In 2 cases the person executed had another person commit the homicide for him, and in 16 cases the facts were not reported in sufficient detail to determine whether the person executed committed the homicide.[17] The survey revealed only 6 cases out of 362 where a nontriggerman felony murderer was executed. All six executions took place in

include an intent element is not applicable here, for it requires that the victim must be "a peace officer who was acting in the lawful discharge of an official duty when he was murdered." § 31–20A–5(A). The remaining State, Vermont, limits the death penalty to narrow circumstances not present here. See n. 11, *supra.*

There is no disagreement that three States require a culpable mental state short of intent before a nontriggerman may be put to death, compare n. 8, *supra,* with *post,* at 821, n. 37, a mental state which Enmund was not proved to possess. Similarly, the dissent's second category of seven States which authorize the death penalty only if the defendant had specific intent to kill the victim differs from our group of specific-intent States only because we include New Mexico in that group. Compare n. 7, *supra,* with *post,* at 821–822, n. 38. Finally, there is no disagreement that three States restrict application of the death penalty to felony murderers who actually kill. Compare n. 9, *supra,* with *post,* at 822, n. 39.

[16] See App. D to Brief for Petitioner.

[17] There is no reason to believe that this group of 16 contains a higher proportion of nontriggermen than does the rest of the defendants studied.

1955. By contrast, there were 72 executions for rape in this country between 1955 and this Court's decision in *Coker* v. *Georgia* in 1977.[18]

That juries have rejected the death penalty in cases such as this one where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder is also shown by petitioner's survey of the Nation's death-row population.[19] As of October 1, 1981, there were 796 inmates under sentences of death for homicide. Of the 739 for whom sufficient data are available, only 41 did not participate in the fatal assault on the victim. Of the 40 among the 41 for whom sufficient information was available, only 16 were not physically present when the fatal assault was committed. These 16 prisoners included only 3, including petitioner, who were sentenced to die absent a finding that they hired or solicited someone else to kill the victim or participated in a scheme designed to kill the victim. The figures for Florida are similar.[20] Forty-five felony murderers are currently on death row. The Florida Supreme Court either found or affirmed a trial court or jury finding that the defendant intended life to be taken in 36 cases. In eight cases the courts made no finding with respect to intent, but the defendant was the triggerman in each case. In only one case—Enmund's—there was no finding of an intent to kill and the defendant was not the triggerman.[21]

---

[18] See NAACP Legal Defense and Educational Fund, Inc., Death Row U. S. A. 1, n. * (Oct. 20, 1981).

[19] See App. E to Brief for Petitioner; NAACP Legal Defense and Educational Fund, Inc., Death Row U. S. A. (Oct. 20, 1981).

[20] See App. to Reply Brief for Petitioner A–1—A–7.

[21] These statistics concerning the number of vicarious felony murderers who have been executed and the number of them on death row are consistent with the findings of a study of 111 cases in which the defendant was found guilty of a capital crime and hence could have received the death penalty. Kalven & Zeisel, The American Jury and the Death Penalty, 33 U. Chi. L. Rev. 769 (1966). The authors found that juries rebel "at imposing the death penalty for the vicarious criminal responsibility of the defend-

The State does not challenge this analysis of the Florida cases.

The dissent criticizes these statistics on the ground that they do not reveal the percentage of homicides that were charged as felony murders or the percentage of cases where the State sought the death penalty for an accomplice guilty of felony murder. *Post*, at 818–819. We doubt whether it is possible to gather such information, and at any rate, it would be relevant if prosecutors rarely sought the death penalty for accomplice felony murder, for it would tend to indicate that prosecutors, who represent society's interest in punishing crime, consider the death penalty excessive for accomplice felony murder. The fact remains that we are not aware of a single person convicted of felony murder over the past quarter century who did not kill or attempt to kill, and did not intend the death of the victim, who has been executed, and that only three persons in that category are presently sentenced to die. Nor can these figures be discounted by attributing to petitioner the argument that "death is an unconstitutional penalty absent an intent to kill," *post*, at 819, and observing that the statistics are incomplete with respect to intent. Petitioner's argument is that because he did not kill, attempt to kill, *and* he did not intend to kill, the death penalty is disproportionate as applied to him, and the statistics he cites are adequately tailored to demonstrate that juries— and perhaps prosecutors as well—consider death a disproportionate penalty for those who fall within his category.[22]

---

ant," *id.*, at 776, to the extent that felony murder and accomplice factors accounted for more jury decisions not to impose the death penalty when the trial judge decided to impose the death penalty than any other factor. *Id.*, at 777. The authors had anticipated that "because of the rigidity of the felony murder rule, the jury's sense of equity would produce a broad area of disagreement." *Id.*, at 776, n. 10. However, they found that "disagreement over the rule emerges only at the level of the death penalty." *Ibid.*

[22] "[T]he climate of international opinion concerning the acceptability of a particular punishment" is an additional consideration which is "not irrelevant." *Coker v. Georgia*, 433 U. S. 584, 596, n. 10 (1977). It is thus

## III

Although the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. We have concluded, along with most legislatures and juries, that it does not.

We have no doubt that robbery is a serious crime deserving serious punishment. It is not, however, a crime "so grievous an affront to humanity that the only adequate response may be the penalty of death." *Gregg* v. *Georgia*, 428 U. S., at 184 (footnote omitted). "[I]t does not compare with murder, which does involve the unjustified taking of human life. Although it may be accompanied by another crime, [robbery] by definition does not include the death of or even the serious injury to another person. The murderer kills; the [robber], if no more than that, does not. Life is over for the victim of the murderer; for the [robbery] victim, life . . . is not over and normally is not beyond repair." *Coker* v. *Georgia*, 433 U. S., at 598 (footnote omitted). As was said of the crime of rape in *Coker*, we have the abiding conviction that the death penalty, which is "unique in its severity and irrevocability," *Gregg* v. *Georgia*, *supra*, at 187, is an excessive penalty for the robber who, as such, does not take human life.

---

worth noting that the doctrine of felony murder has been abolished in England and India, severely restricted in Canada and a number of other Commonwealth countries, and is unknown in continental Europe. ALI, Model Penal Code § 210.2, pp. 39–40 (Off. Draft and Revised Comments 1980) (hereafter Model Penal Code). It is also relevant that death sentences have not infrequently been commuted to terms of imprisonment on the grounds of the defendant's lack of premeditation and limited participation in the homicidal act. See Wolfgang, Kelly, & Nolde, Comparison of the Executed and Commuted Among Admissions to Death Row, 53 J. Crim. L. C. & P. S. 301, 310 (1962).

Here the robbers did commit murder; but they were subjected to the death penalty only because they killed as well as robbed. The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for Enmund's own conduct. The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on "individualized consideration as a constitutional requirement in imposing the death sentence," *Lockett* v. *Ohio*, 438 U. S. 586, 605 (1978) (footnote omitted), which means that we must focus on "relevant facets of the character and record of the individual offender." *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976). Enmund himself did not kill or attempt to kill; and, as construed by the Florida Supreme Court, the record before us does not warrant a finding that Enmund had any intention of participating in or facilitating a murder. Yet under Florida law death was an authorized penalty because Enmund aided and abetted a robbery in the course of which murder was committed. It is fundamental that "causing harm intentionally must be punished more severely than causing the same harm unintentionally." H. Hart, Punishment and Responsibility 162 (1968). Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the Kerseys. This was impermissible under the Eighth Amendment.

In *Gregg* v. *Georgia* the opinion announcing the judgment observed that "[t]he death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." 428 U. S., at 183 (footnote omitted). Unless the death penalty when applied to those in Enmund's position measurably contributes to one or both of these goals, it "is nothing more than the purposeless and needless imposition of pain and suffering," and hence an unconstitutional punishment. *Coker* v. *Georgia, supra,* at 592. We are quite unconvinced, however, that the threat

that the death penalty will be imposed for murder will measurably deter one who does not kill and has no intention or purpose that life will be taken. Instead, it seems likely that "capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation," *Fisher* v. *United States*, 328 U. S. 463, 484 (1946) (Frankfurter, J., dissenting), for if a person does not intend that life be taken or contemplate that lethal force will be employed by others, the possibility that the death penalty will be imposed for vicarious felony murder will not "enter into the cold calculus that precedes the decision to act." *Gregg* v. *Georgia, supra,* at 186 (footnote omitted).

It would be very different if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony. But competent observers have concluded that there is no basis in experience for the notion that death so frequently occurs in the course of a felony for which killing is not an essential ingredient that the death penalty should be considered as a justifiable deterrent to the felony itself. Model Penal Code § 210.2, Comment, p. 38, and n. 96. This conclusion was based on three comparisons of robbery statistics, each of which showed that only about one-half of one percent of robberies resulted in homicide.[23] The most recent national

---

[23] The statistics relied upon by the American Law Institute may be summarized as follows:

| Date & Location | No. of Robberies | Robberies Accompanied by Homicide | % |
|---|---|---|---|
| Cook County, Ill. 1926–1927 | 14,392 (est.) | 71 | .49 |
| Philadelphia, Pa. 1948–1952 | 6,432 | 38 | .59 |
| New Jersey 1975 | 16,273 | 66 | .41 |

Model Penal Code § 210.2, Comment, p. 38, n. 96.

crime statistics strongly support this conclusion.[24]   In addition to the evidence that killings only rarely occur during robberies is the fact, already noted, that however often death occurs in the course of a felony such as robbery, the death penalty is rarely imposed on one only vicariously guilty of the murder, a fact which further attenuates its possible utility as an effective deterrence.

As for retribution as a justification for executing Enmund, we think this very much depends on the degree of Enmund's culpability—what Enmund's intentions, expectations, and actions were.   American criminal law has long considered a defendant's intention—and therefore his moral guilt—to be critical to "the degree of [his] criminal culpability," *Mullaney* v. *Wilbur*, 421 U. S. 684, 698 (1975), and the Court has found criminal penalties to be unconstitutionally excessive in the absence of intentional wrongdoing.   In *Robinson* v. *California*, 370 U. S. 660, 667 (1962), a statute making narcotics addiction a crime, even though such addiction "is apparently an illness which may be contracted innocently or involuntarily," was struck down under the Eighth Amendment.   Similarly, in *Weems* v. *United States*, the Court invalidated a statute making it a crime for a public official to make a false entry in a public record but not requiring the offender to "injur[e] any one by his act or inten[d] to injure any one."   217 U. S., at 363.   The Court employed a similar approach in *Godfrey* v. *Georgia*, 446 U. S. 420, 433 (1980), reversing a death sentence based on the existence of an aggravating circumstance because the defendant's crime did not reflect "a consciousness

---

[24] An estimated total of 548,809 robberies occurred in the United States in 1980.   U. S. Dept. of Justice, Federal Bureau of Investigation, Uniform Crime Reports 17 (1981).   Approximately 2,361 persons were murdered in the United States in 1980 in connection with robberies, *id.*, at 13, and thus only about 0.43% of robberies in the United States in 1980 resulted in homicide.   See also Cook, The Effect of Gun Availability on Robbery and Robbery Murder, in 3 R. Haveman & B. Zellner, Policy Studies Review Annual 743, 747 (1980) (0.48% of all robberies result in murder).

materially more 'depraved' than that of any person guilty of murder."

For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt. Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts. This is the judgment of most of the legislatures that have recently addressed the matter, and we have no reason to disagree with that judgment for purposes of construing and applying the Eighth Amendment.

## IV

Because the Florida Supreme Court affirmed the death penalty in this case in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken, we reverse the judgment upholding the death penalty and remand for further proceedings not inconsistent with this opinion.

*So ordered.*

JUSTICE BRENNAN, concurring.

I join the Court's opinion. However, I adhere to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. See *Gregg* v. *Georgia,* 428 U. S. 153, 227 (1976) (dissenting opinion).

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE REHNQUIST join, dissenting.

Today the Court holds that the Eighth Amendment prohibits a State from executing a convicted felony murderer. I dissent from this holding not only because I believe that it is not supported by the analysis in our previous cases, but also

because today's holding interferes with state criteria for assessing legal guilt by recasting intent as a matter of federal constitutional law.

I

The evidence at trial showed that at approximately 7:30 a. m. on April 1, 1975, Sampson and Jeanette Armstrong approached the back door of Thomas and Eunice Kersey's farmhouse on the pretext of obtaining water for their overheated car.[1] When Thomas Kersey retrieved a water jug to help the Armstrongs, Sampson Armstrong grabbed him, held a gun to him, and told Jeanette Armstrong to take his wallet. Hearing her husband's cries for help, Eunice Kersey came around the side of the house with a gun and shot Jeanette Armstrong. Sampson Armstrong, and perhaps Jeanette Armstrong, returned the fire, killing both of the Kerseys.[2] The Armstrongs dragged the bodies into the kitchen, took Thomas Kersey's money, and fled to a nearby car, where the petitioner, Earl Enmund, was waiting to help the Armstrongs escape. Record 1348–1351.[3]

Ida Jean Shaw[4] testified that on March 31 the petitioner and the two Armstrongs were staying at her house. When she awoke on April 1, the day of the murders, the petitioner,

---

[1] Much of the evidence concerning these crimes came from J. B. Neal, to whom Sampson Armstrong made numerous admissions on the day of the murders. See Record 1344–1365.

[2] J. B. Neal testified that Armstrong had told him that two guns were involved; Jeanette had one and Sampson had the other. *Id.*, at 1354.

[3] An autopsy revealed that Mr. Kersey had been shot twice, once with a .38-caliber bullet, and once with a .22-caliber bullet. Mrs. Kersey had been shot six times; of the bullets that could be identified, two were fired from a .38-caliber gun, and one from a .22-caliber gun. According to a firearms expert, the .22-caliber bullets were fired from the same gun, and the .38-caliber bullets were fired from the same gun. See 399 So. 2d 1362, 1364 (Fla. 1981).

[4] Ida Jean Shaw was the petitioner's common-law wife and Jeanette Armstrong's mother. She was later given immunity from prosecution in return for her testimony. Record 1178–1179.

Jeanette, and Sampson, as well as Shaw's 1969 yellow Buick, were gone. *Id.*, at 1185–1186. A little after eight o'clock, either the petitioner or Sampson Armstrong entered the house and told her that Jeanette had been shot. *Id.*, at 1187–1188. After learning that Jeanette had been shot during a robbery, Shaw asked the petitioner "[w]hy he did it." Enmund answered that he had decided to rob Thomas Kersey after he had seen Kersey's money a few weeks earlier. *Id.*, at 1205.[5] At the same time, Sampson Armstrong volunteered that he had made sure that the Kerseys were dead. *Id.*, at 1207–1208.

Ida Jean Shaw also testified that, pursuant to the petitioner's and Sampson Armstrong's instructions, she had disposed of a .22-caliber pistol that she normally kept in her car, as well as a .38-caliber pistol belonging to the Armstrongs. *Id.*, at 1198–1202. The murder weapons were never recovered.[6]

In his closing argument, the prosecutor did not argue that Earl Enmund had killed the Kerseys. Instead, he maintained that the petitioner had initiated and planned the

---

[5] Thomas Kersey normally kept large sums of money in his wallet and indiscriminately showed the cash to people he dealt with. A few weeks before his murder, Kersey revealed the contents of his wallet to the petitioner and bragged that at any time he could "dig up $15,000, $16,000." 399 So. 2d, at 1365. See Record 1205–1206.

[6] Ida Jean Shaw's trial testimony contradicted her earlier statements to police. When police initially questioned her, she insisted that Jeanette had been shot by an unknown assailant while she and Jeanette had been traveling to a nearby town. *Id.*, at 1191–1192. Later she gave investigators a statement implicating the petitioner and Sampson Armstrong in the murders. *Id.*, at 1209–1210. Subsequently, she gave two more statements repudiating the statement implicating the petitioner. *Id.*, at 1208–1209.

In his closing argument, the prosecutor acknowledged the conflict between Ida Jean Shaw's testimony that she was not in the yellow Buick the morning of the murders, and the testimony of a witness who saw her in the car shortly before and after the murders. The prosecutor deemed the inconsistency irrelevant. *Id.*, at 1571–1572.

armed robbery, and was in the car during the killings. According to the prosecutor, "Sampson Armstrong killed the old people." *Id.*, at 1577.[7]

After deliberating for four hours, the jury found Sampson Armstrong and the petitioner each guilty of two counts of first-degree murder[8] and one count of robbery.[9] The jury

---

[7] At the sentencing hearing, the prosecutor theorized that the petitioner was not the "trigger man," but the "person who set it all up." *Id.*, at 1679. The prosecutor admitted that he did not "know whether [the petitioner] set foot inside that house or not. But he drove them there. He set it up, planned it." *Id.*, at 1679–1680. In this Court as well, the State acknowledges that the petitioner "was apparently not the triggerman in the two murders involved in his *[sic]* case." Brief in Opposition 14.

[8] In Florida at the time of the Kersey murders, first-degree murder was defined in Fla. Stat. § 782.04(1)(a) (1973) as

"[t]he unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any . . . robbery . . . ."

In instructing the jury on first-degree murder, the judge read the above provision verbatim. Record 1605–1606. He also added that

"[t]he killing of a human being while engaged in the perpetration of or in the attempt to perpetrate the offense of robbery is murder in the first degree even though there is no premeditated design or intent to kill." *Id.*, at 1606.

Distinguishing first- and second-degree felony murder, the judge stated:

"In order to sustain a conviction of first degree murder while engaging in the perpetration of or in the attempted perpetration of the crime of robbery, the evidence must establish beyond a reasonable doubt that the defendant was actually present and was actively aiding and abetting the robbery or attempted robbery, and that the unlawful killing occurred in the perpetration of or in the attempted perpetration of the robbery.

"In order to sustain a conviction of second degree murder while engaged in the perpetration of or the attempted perpetration of robbery, the evidence must establish beyond a reasonable doubt that the unlawful killing was committed in the perpetration of or in the attempted perpetration of robbery, and that the defendant actually, although not physically present at the time of the commission of the offense, did, nonetheless, procure, counsel, command or aid another to commit the crime." *Id.*, at 1609–1610.

[9] On the motion of the petitioner and the prosecution, Jeanette Armstrong's trial had been severed from the trial of her codefendants. *Id.*, at

then heard evidence pertaining to the appropriate sentence for the two defendants, and recommended the death penalty for each defendant on each of the murder counts.[10]

In its sentencing findings,[11] the trial court found four statutory aggravating circumstances regarding the petitioner's involvement in the murder: (1) the petitioner previously had been convicted of a felony involving the use of violence (an armed robbery in 1957), Fla. Stat. § 921.141(5)(b) (1981); (2) the murders were committed during the course of a robbery, § 921.141(5)(d); (3) the murders were committed for pecuniary gain, § 921.141(5)(f); and (4) the murders were especially heinous, atrocious, or cruel because the Kerseys had been shot in a prone position in an effort to eliminate them as witnesses, § 921.141(5)(h). App. 30–31; 399 So. 2d 1362, 1371–1372 (Fla. 1981).[12]

---

50, 57. Jeanette Armstrong was tried first and convicted of two counts of second-degree murder and one count of robbery. The trial judge sentenced her to three consecutive life sentences. 399 So. 2d, at 1371.

[10] Under Florida law, the "court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment." Fla. Stat. § 921.141(1) (1981). The jury renders only an "advisory sentence" based on the mitigating and aggravating circumstances. § 921.141(2).

At the sentencing hearing, the petitioner presented no evidence, Record 1677, but his attorney argued that the death penalty was inappropriate because at most the evidence showed that the petitioner saw Thomas Kersey's money, suggested the robbery, and drove the Armstrongs to the Kersey house. *Id.*, at 1683–1684. He also argued that death was an excessive penalty because the gunfight was spontaneous, and beyond the petitioner's control. *Id.*, at 1684.

[11] Initially, the trial court failed to make written findings as required by Fla. Stat. § 921.141(3) (1981). On the first state appeal, the Florida Supreme Court remanded the case for such findings. See App. 29.

[12] Regarding the extent of the petitioner's involvement, the trial court reasoned that because two different guns had been used in the murders, and because Jeanette Armstrong had been seriously wounded by gunfire, the petitioner must have fired one of the guns. Moreover, since each of the Kerseys was injured by a bullet of each type, the petitioner must have shot each victim. *Id.*, at 31; 399 So. 2d, at 1372.

The trial court also found that *"none* of the statutory mitigating circumstances applied" to the petitioner. App. 32 (emphasis in original). Most notably, the court concluded that the evidence clearly showed that the petitioner was an accomplice to the capital felony and that his participation had not been "relatively minor," but had been major in that he "planned the capital felony and actively participated in an attempt to avoid detection by disposing of the murder weapons." *Ibid.;* 399 So. 2d, at 1373. See Fla. Stat. § 921.141(6)(d) (1981).[13]

Considering these factors, the trial court concluded that the "aggravating circumstances of these capital felonies outweigh the mitigating circumstances," and imposed the death penalty for each count of murder. App. 32; 399 So. 2d, at 1373. The court sentenced the petitioner to life imprisonment for the robbery. App. 28.[14]

---

[13] The court also rejected the other statutory mitigating circumstances. In particular, the petitioner did not have a record free of criminal convictions, Fla. Stat. § 921.141(6)(a) (1981); there was no evidence that he had acted under the influence of extreme mental or emotional disturbance, § 921.141(6)(b); there was no evidence that the victims were participants in or consented to the crimes, § 921.141(6)(c); there was no evidence that he acted under extreme duress or under the substantial domination of another person, § 921.141(6)(e); there was no evidence that the petitioner was incapable of appreciating the criminality of his conduct or conforming his conduct to the requirements of law, § 921.141(6)(f); and because he was 42 years old at the time of the offense, his age was not a mitigating factor, § 921.141(6)(g). App. 32; 399 So. 2d, at 1372–1373.

[14] The trial court made nearly identical findings for Sampson Armstrong. In particular, it found that the murders were committed during the course of a robbery, that they were committed for pecuniary gain, and that they were especially heinous, atrocious, or cruel. See *Armstrong* v. *State,* 399 So. 2d 953, 960–961 (Fla. 1981). The trial court considered the only possible mitigating circumstance to be Armstrong's age (23), but did not actually find that fact to be mitigating. See *id.,* at 962 ("the factor of age was given no consideration"). Finding that the aggravating circumstances outweighed the mitigating circumstances, the trial judge imposed the death penalty for each murder conviction, and imposed a life sentence for the robbery. *Id.,* at 955, 962.

On appeal, the Florida Supreme Court affirmed the petitioner's convictions and sentences.[15]   In challenging his convictions for first-degree murder, the petitioner claimed that there was no evidence that he had committed premeditated murder, or that he had been present aiding and abetting the robbery when the Kerseys were shot.   He argued that since the jury properly could have concluded only that he was in the car on the highway when the murders were committed, he could be found guilty at most of second-degree murder under the State's felony-murder rule.[16]

The court rejected this argument.   Quoting from an earlier case, the Florida Supreme Court held:

> "'[A]n individual who personally kills another during the perpetration or attempt to perpetrate one of the enumerated felonies is guilty of first degree murder. . . . Moreover, the felon's liability for first degree murder extends to all of his co-felons who are personally present. As perpetrators of the underlying felony, they are principals in the homicide.   In Florida, as in the majority of jurisdictions, the felony murder rule and the law of principals combine to make a felon generally responsible for the lethal acts of his co-felon.   Only if the felon is an accessory before the fact and not personally present does liability attach under the second degree murder provision of the applicable statute in the instant case.'"   399 So. 2d, at 1369 (quoting *Adams* v. *State*, 341 So. 2d 765, 768–769 (Fla. 1976) (footnote omitted), cert. denied, 434 U. S. 878 (1977)).

---

[15] The Florida Supreme Court also affirmed the convictions and sentences of Sampson Armstrong.   See *Armstrong* v. *State*, *supra*, at 960.

[16] Second-degree murder, based on felony murder, is defined in Fla. Stat. § 782.04(3) (1973):

"[W]hen committed in the perpetration of, or in the attempt to perpetrate, any . . . robbery, . . . except as provided in subsection (1), it shall be murder in the second degree . . . punishable by imprisonment in the state prison for life or for such term of years as may be determined by the court."

Consequently, the critical issue regarding liability was whether the petitioner's conduct would make him a principal or merely an accessory before the fact to the underlying robbery. Under Florida law at the time of the murders, "if the accused was present aiding and abetting the commission or attempt of one of the violent felonies listed in the first-degree murder statute, he is equally guilty, with the actual perpetrator of the underlying felony, of first-degree murder." 399 So. 2d, at 1370. Moreover,

> "'the presence of the aider and abetter need not have been actual, but it is sufficient if he was constructively present, provided the aider, pursuant to a previous understanding, is sufficiently near and so situated as to abet or encourage, or to render assistance to, the actual perpetrator in committing the felonious act or in escaping after its commission.'" *Ibid.* (quoting *Pope* v. *State*, 84 Fla. 428, 446, 94 So. 865, 871 (1922)).

The court noted that there "was no direct evidence at trial that Earl Enmund was present at the back door of the Kersey home when the plan to rob the elderly couple led to their being murdered." 399 So. 2d, at 1370.[17] Instead,

> "the only evidence of the degree of his participation is the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes. The jury could have concluded that he was there, a few hundred feet away, waiting to help the robbers escape with the Kerseys' money." *Ibid.*

This evidence, the court concluded, was sufficient to find the petitioner to be a principal under state law, "constructively present aiding and abetting the commission of the crime of robbery," and thus guilty of first-degree murder. *Ibid.*

---

[17] The court also noted that Sampson Armstrong's admissions to J. B. Neal made no mention of the petitioner, and that the petitioner's admissions to Ida Jean Shaw indicated only "his complicity." 399 So. 2d, at 1370.

Turning to the trial court's written sentencing findings, the State Supreme Court rejected two of the four aggravating circumstances. First, the court held that two of the trial judge's findings—that the murders were committed both in the course of robbery and for pecuniary gain—referred to the same aspect of the petitioner's crime. Consequently, these facts supported only one aggravating circumstance. Second, citing *Armstrong* v. *State*, 399 So. 2d 953 (Fla. 1981), the court held that "[t]he recited circumstance, that the murders were especially heinous, atrocious, and cruel, cannot be approved." 399 So. 2d, at 1373.[18] The court affirmed the trial court's findings that none of the statutory mitigating circumstances applied. *Ibid.* Because one of those findings was that Enmund's participation in the capital felony was not minor, due to his role in planning the robbery, the State Supreme Court implicitly affirmed the finding that Enmund had planned the robbery.

Regarding the petitioner's claim that imposition of the death penalty, absent a showing that he intended to kill, would violate the Eighth Amendment's ban on cruel and unusual punishments, the court simply stated that the petitioner "offers us no binding legal authority that directly supports this proposition, and we therefore reject it." *Id.*, at 1371.

---

[18] In *Armstrong*, the Florida Supreme Court expressly had rejected the trial court's conclusion that the Kerseys were murdered in order to eliminate them as witnesses. "It simply cannot be said that there was proof that the robbers killed in order to assure that there would be no witnesses against them." 399 So. 2d, at 963. On the contrary, "[t]he only direct account of what transpired is from the testimony of J. B. Neal about Armstrong's statement to him. By that account, the shootings were indeed spontaneous and were precipitated by the armed resistance of Mrs. Kersey." *Ibid.* In reaching this conclusion, the State Supreme Court also rejected the trial court's conclusions derived from the pathologist's testimony. Rather than indicating that the victims were prone when shot, the pathologist's testimony "as to the direction of fire and the positions of the victims when shot [was] equivocal at best." *Ibid.*

## II

Earl Enmund's claim in this Court is that the death sentence imposed by the Florida trial court, and affirmed by the Florida Supreme Court, is unconstitutionally disproportionate to the role he played in the robbery and murders of the Kerseys.[19] In particular, he contends that because he had no actual intent to kill the victims—in effect, because his behavior and intent were no more blameworthy than that of any robber—capital punishment is too extreme a penalty.[20]

In *Gregg* v. *Georgia*, 428 U. S. 153 (1976), a majority of this Court concluded that the death penalty does not invariably violate the Cruel and Unusual Punishments Clause of the Eighth Amendment.[21] See *id.*, at 187 (opinion of Stewart, POWELL, and STEVENS, JJ.) ("[W]hen a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime. It is an extreme sanction, suitable to the most extreme of crimes") (footnote omitted); *id.*, at 226 (opinion of WHITE, J.) (rejecting the argument that "the death penalty, however imposed and for whatever crime, is cruel and unusual punishment");

---

[19] In this Court, the petitioner neither challenges his convictions for robbery and felony murder nor argues that the State has overstepped constitutional bounds in defining murder to include felony murder. The petitioner's sole challenge is to the penalty imposed for the murders.

[20] Although the petitioner ostensibly relies on the fact that he was not the triggerman, the core of his argument is that the death penalty is disproportionate to his crime because he did not have the specific intent to kill the Kerseys. Pulling the trigger is only one factor, albeit a significant one, in determining intent. See Tr. of Oral Arg. 21–23 (counsel for petitioner asserting that so long as a defendant had the intent to kill, he need not actually have pulled the trigger in order to be subjected to capital punishment, and that even if he had pulled the trigger, he would not be subject to the death penalty absent a specific intent to kill).

[21] The Eighth Amendment provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

*id.*, at 227 (BLACKMUN, J., concurring in judgment). In no case since *Gregg* and its companion cases,[22] has this Court retreated from that position.[23] Recognizing the constitutional-

---

[22] See *Roberts (Stanislaus)* v. *Louisiana*, 428 U. S. 325 (1976) (holding that Louisiana's mandatory death penalty statute violated the Eighth and Fourteenth Amendments); *Woodson* v. *North Carolina*, 428 U. S. 280 (1976) (holding that the State's mandatory death penalty statute violated the Eighth and Fourteenth Amendments); *Jurek* v. *Texas*, 428 U. S. 262 (1976) (upholding the Texas death penalty statute); *Proffitt* v. *Florida*, 428 U. S. 242 (1976) (upholding Florida's death penalty statute).

[23] In only one case since *Gregg* has this Court upheld a challenged death sentence. See *Dobbert* v. *Florida*, 432 U. S. 282 (1977) (holding that changes in the death penalty statute between the time of the murder and the sentencing did not amount to an *ex post facto* violation). In five cases, the Court vacated the death sentence because the sentencer could not or did not consider all mitigating factors proffered by the defendant. See *Roberts (Harry)* v. *Louisiana*, 431 U. S. 633 (1977) *(per curiam); Lockett* v. *Ohio*, 438 U. S. 586 (1978) (plurality opinion); *Bell* v. *Ohio*, 438 U. S. 637 (1978) (plurality opinion); *Green* v. *Georgia*, 442 U. S. 95 (1979) *(per curiam); Eddings* v. *Oklahoma*, 454 U. S. 104 (1982) (adopting the reasoning of the *Lockett* plurality as the holding of the Court). In two cases, the Court reversed the judgments affirming the death sentences because the jury had been selected in violation of *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968). See *Adams* v. *Texas*, 448 U. S. 38 (1980); *Davis* v. *Georgia*, 429 U. S. 122 (1976) *(per curiam)*. In five other cases, the Court vacated death sentences for a variety of reasons unrelated to the proportionality of the punishment to the crime. See *Gardner* v. *Florida*, 430 U. S. 349 (1977) (plurality opinion) (due process violated when defendant had no chance to explain or deny information given to the sentencing judge); *Godfrey* v. *Georgia*, 446 U. S. 420 (1980) (plurality opinion) (reversing the death sentence because the aggravating circumstance relied upon by jury was not so tailored as to avoid arbitrary and capricious infliction of death penalty); *Beck* v. *Alabama*, 447 U. S. 625 (1980) (holding that death penalty may not be imposed where jury was precluded from considering lesser included noncapital offense, when evidence existed to support such a verdict); *Bullington* v. *Missouri*, 451 U. S. 430 (1981) (holding that Double Jeopardy Clause prevented imposition of death sentence upon retrial when jury had imposed life imprisonment at the first trial); *Estelle* v. *Smith*, 451 U. S. 454 (1981) (holding that admission of psychiatrist's testimony at the penalty phase of the capital trial violated the defendant's Fifth Amendment

ity of the death penalty, however, only marks the beginning of the inquiry, for Earl Enmund was not convicted of murder as it is ordinarily envisioned—a deliberate and premeditated, unlawful killing. Rather, through the doctrine of accessorial liability, the petitioner has been convicted of two murders that he did not specifically intend.[24] Thus, it is necessary to examine the concept of proportionality as enunciated in this Court's cases to determine whether the penalty imposed on Earl Enmund is unconstitutionally disproportionate to his crimes.

## A

The Eighth Amendment concept of proportionality was first fully expressed in *Weems* v. *United States,* 217 U. S. 349 (1910). In that case, defendant Weems was sentenced to 15 years at hard labor for falsifying a public document.

---

privilege against self-incrimination because he had not been told before his psychiatric examination that his statements could be used against him during the sentencing proceeding).

In *Coker* v. *Georgia,* 433 U. S. 584 (1977), the Court vacated a death sentence for a man who had been convicted of rape of an adult woman. Nevertheless, the Court made clear that the death penalty is not *per se* disproportionate to the crime of murder. See, *e. g., id.,* at 591 (opinion of WHITE, J.) ("It is now settled that the death penalty is not invariably cruel and unusual punishment within the meaning of the Eighth Amendment; . . . neither is it always disproportionate to the crime for which it is imposed"); *id.,* at 604 (opinion of BURGER, C. J.) (accepting "that the Eighth Amendment's concept of disproportionality bars the death penalty for minor crimes," but rejecting the argument that death is a disproportionate punishment for rape, much less murder).

[24] Strictly speaking, this Court cannot state unequivocally whether the petitioner specifically intended either to kill the Kerseys or to have them killed because the trial court made no findings on these issues. The trial court, however, did make the finding, not rejected by the Florida Supreme Court, that the petitioner's participation was not minor, but "major" in that he "planned the capital felony and actively participated in an attempt to avoid detection by disposing of the murder weapons." App. 32. Accordingly, I proceed on the assumption that the petitioner's only intent was to commit an armed robbery with his accomplices, the Armstrongs.

After remarking that "it is a precept of justice that punishment for crime should be graduated and proportioned to offense," *id.*, at 367, and after comparing Weems' punishment to the punishments for other crimes, the Court concluded that the sentence was cruel and unusual. *Id.*, at 381.

Not until two-thirds of a century later, in *Coker* v. *Georgia*, 433 U. S. 584 (1977), did the Court declare another punishment to be unconstitutionally disproportionate to the crime. Writing for himself and three other Members of the Court, JUSTICE WHITE concluded that death is a disproportionate penalty for the crime of raping an adult woman. *Id.*, at 597.[25] In reaching this conclusion, the plurality was careful to inform its judgment "by objective factors to the maximum possible extent [by giving attention] to the public attitudes concerning a particular sentence—history and precedent, legislative attitudes, and the response of juries reflected in their sentencing decisions." *Id.*, at 592. The plurality's resort to objective factors was no doubt an effort to derive "from the evolving standards of decency that mark the progress of a maturing society" the meaning of the requirement of proportionality contained within the Eighth Amendment. *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (opinion of Warren, C. J.).

The plurality noted that within the previous 50 years a majority of the States had never authorized death as a punishment for rape. More significantly to the plurality, only 3 of the 35 States that immediately reinstituted the death penalty following the Court's judgment in *Furman* v. *Georgia*, 408 U. S. 238 (1972) (invalidating nearly all state capital punish-

---

[25] JUSTICE POWELL concurred in the plurality's reasoning in concluding that "ordinarily" death was disproportionate for such a crime, but stopped short of a *per se* rule. 433 U. S., at 601. JUSTICE BRENNAN and JUSTICE MARSHALL concurred in the judgment, adhering to their previously announced views that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. See *id.*, at 600–601.

ment statutes), defined rape as a capital offense.[26]   The plurality also considered "the sentencing decisions that juries have made in the course of assessing whether capital punishment is an appropriate penalty for the crime being tried." 433 U. S., at 596.   See *Gregg* v. *Georgia,* 428 U. S., at 181 (opinion of Stewart, POWELL, and STEVENS, JJ.) ("The jury also is a significant and reliable objective index of contemporary values because it is so directly involved").   From the available data, the plurality concluded that in at least 90% of the rape convictions since 1973, juries in Georgia had declined to impose the death penalty.   433 U. S., at 597.

Thus, the conclusion reached in *Coker* rested in part on the Court's observation that *both* legislatures *and* juries firmly rejected the penalty of death for the crime of rape.   See *Woodson* v. *North Carolina,* 428 U. S. 280, 293 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.) (concluding that the State's mandatory death penalty statute violates the Eighth Amendment because the "two crucial indicators of evolving standards of decency respecting the imposition of punishment in our society—jury determinations and legislative enactments—both point conclusively to the repudiation of automatic death sentences").

In addition to ascertaining "contemporary standards," the plurality opinion also considered qualitative factors bearing on the question whether the death penalty was disproportionate, for "the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment."   433 U. S., at 597.   The plurality acknowledged that a rapist is almost as blameworthy as a murderer, describing

---

[26] In fact, two of those States, Louisiana and North Carolina, did not define rape as a capital felony when they reenacted their death penalty statutes following their invalidation in *Woodson* v. *North Carolina,* 428 U. S. 280 (1976), and *Roberts* v. *Louisiana,* 428 U. S. 325 (1976).   See 433 U. S., at 594.   Consequently, at the time *Coker* was decided only Georgia authorized the death penalty for the rape of an adult woman.

the crime of rape as "highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim." *Ibid.* Despite the enormity of the crime of rape, however, the Court concluded that the death penalty was "grossly out of proportion to the severity of the crime," *id.*, at 592, in part because the harm caused by a rape "does not compare with murder, which does involve the unjustified taking of human life." *Id.*, at 598.

*Coker* teaches, therefore, that proportionality—at least as regards capital punishment—not only requires an inquiry into contemporary standards as expressed by legislators and jurors, but also involves the notion that the magnitude of the punishment imposed must be related to the degree of the harm inflicted on the victim, as well as to the degree of the defendant's blameworthiness.[27]  Moreover, because they turn on considerations unique to each defendant's case, these latter factors underlying the concept of proportionality are reflected in this Court's conclusion in *Lockett* v. *Ohio*, 438 U. S. 586, 605 (1978), that "individualized consideration [is] a constitutional requirement in imposing the death sentence" (opinion of BURGER, C. J.) (footnote omitted).  See *id.*, at 613 (opinion of BLACKMUN, J.) ("the Ohio judgment in this case improperly provided the death sentence for a defendant who only aided and abetted a murder, without permitting any consideration by the sentencing authority of the extent of her involvement, or the degree of her *mens rea*, in the commission of the homicide").

---

[27] The Court has conducted a less searching inquiry for punishments less than death.  See *Rummel* v. *Estelle*, 445 U. S. 263 (1980) (upholding, against an Eighth Amendment challenge, a life sentence imposed under a state recidivist statute); *Hutto* v. *Davis*, 454 U. S. 370 (1981) *(per curiam)* (upholding, on the basis of *Rummel*, a 40-year sentence for two marihuana convictions).  In *Rummel*, the Court expressly noted that, for purposes of Eighth Amendment analysis, those "decisions applying the prohibition of cruel and unusual punishments to capital cases are of limited assistance in deciding the constitutionality" of prison sentences.  445 U. S., at 272.

In sum, in considering the petitioner's challenge, the Court should decide not only whether the petitioner's sentence of death offends contemporary standards as reflected in the responses of legislatures and juries, but also whether it is disproportionate to the harm that the petitioner caused and to the petitioner's involvement in the crime, as well as whether the procedures under which the petitioner was sentenced satisfied the constitutional requirement of individualized consideration set forth in *Lockett.*

## B

Following the analysis set forth in *Coker*, the petitioner examines the historical development of the felony-murder rule, as well as contemporary legislation and jury verdicts in capital cases, in an effort to show that imposition of the death penalty on him would violate the Eighth Amendment. This effort fails, however, for the available data do not show that society has rejected conclusively the death penalty for felony murderers.

As the petitioner acknowledges, the felony-murder doctrine, and its corresponding capital penalty, originated hundreds of years ago,[28] and was a fixture of English common law until 1957 when Parliament declared that an unintentional killing during a felony would be classified as manslaughter.[29] The common-law rule was transplanted to the American Col-

---

[28] According to one source, at early common law most felonies were capital crimes, but attempts were punished as misdemeanors and accidental killings were not punishable at all. The felony-murder rule was an effort to create felony liability for accidental killings caused during the course of an attempted felony. See ALI, Model Penal Code § 210.2, Comment, p. 31, n. 74 (Off. Draft and Revised Comments 1980).

[29] See English Homicide Act of 1957, 5 & 6 Eliz. 2, ch. 11. The English attitude toward capital punishment, as reflected in recent legislation, differs significantly from American attitudes as reflected in state legislation; in 1965, England abolished the death penalty for all murders. See Murder (Abolition of Death Penalty) Act of 1965, 8 Halsbury's Statutes of England 541 (3d ed. 1969).

onies, and its use continued largely unabated into the 20th century, although legislative reforms often restricted capital felony murder to enumerated violent felonies.[30]

The petitioner discounts the weight of this historical precedent by arguing that jurors and judges widely resisted the application of capital punishment by acquitting defendants in felony-murder cases or by convicting them of noncapital manslaughter.[31] The force of the petitioner's argument is speculative at best, however, for it is unclear what fraction of the jury nullification in this country resulted from dissatisfaction with the capital felony-murder rule. Much of it, surely, was a reaction to the mandatory death penalty, and the failure of the common law and early state statutes to classify murder by degree. In fact, it was in response to juror attitudes toward capital punishment that most jurisdictions by the early part of this century replaced their mandatory death penalty statutes with statutes allowing juries the discretion to decide whether to impose or to recommend the death penalty. See *Woodson* v. *North Carolina,* 428 U. S., at 291–292 (opinion of Stewart, POWELL, and STEVENS, JJ.).[32] Thus, it simply is not possible to conclude that histori-

---

[30] See Comment, The Constitutionality of Imposing the Death Penalty for Felony Murder, 15 Hous. L. Rev. 356, 364–365 (1978); Alderstein, Felony-Murder in the New Criminal Codes, 4 Am. J. Crim. L. 249, 251–252 (1976).

[31] See, *e. g.,* Royal Commission on Capital Punishment 1949–1953, Report 31–33 (1953) (reporting that application of the felony-murder doctrine was limited to those cases in which the verdict could have been intentional murder); Law Revision Commission of the State of New York, 3d Annual Report 665, 668, and n. 444 (1937). It is significant that the New York Legislature rejected the Commission's recommendation of requiring some element of *mens rea,* and instead adopted a scheme giving jurors discretion to recommend life sentences. See 1937 N. Y. Laws, ch. 67.

[32] The extent of jury nullification and the nearly complete repudiation of mandatory death penalty laws led a plurality of this Court to conclude that the "two crucial indicators of evolving standards of decency respecting the imposition of punishment in our society—jury determinations and legislative enactments—both point conclusively to the repudiation of automatic death sentences." *Woodson* v. *North Carolina,* 428 U. S., at 293 (opinion

cally this country conclusively has rejected capital punishment for homicides committed during the course of a felony.

The petitioner and the Court turn to jury verdicts in an effort to show that, by present standards at least, capital punishment is grossly out of proportion to the crimes that the petitioner committed. Surveying all reported appellate court opinions since 1954 involving executions, the petitioner has found that of the 362 individuals executed for homicide, 339 personally committed the homicidal assault, and two others each had another person commit the homicide on his behalf. Only six persons executed were "non-triggermen."[33] A similar trend can be seen in the petitioner's survey of the current death row population.[34] Of the 739 prisoners for whom sufficient data are available, only 40 did not participate in the homicidal assault, and of those, only 3 (including the petitioner) were sentenced to death absent a finding that they had collaborated with the killer in a specific plan to kill. Brief for Petitioner 35–36. See also App. to Reply Brief for Petitioner (showing that of the 45 felony murderers currently on death row in Florida, 36 were found by the State Supreme Court or a trial court to have had the intent to kill; in 8 cases, the state courts made no finding, but the defendant was the triggerman; and in 1, the petitioner's case, the defendant was not the triggerman, and there was no finding of intent to kill).

Impressive as these statistics are at first glance, they cannot be accepted uncritically. So stated, the data do not reveal the number or fraction of homicides that were charged as felony murders, or the number or fraction of cases in which the State sought the death penalty for an accomplice guilty of

---

of Stewart, POWELL, and STEVENS, JJ.). These factors supported the Court's conclusion that North Carolina's mandatory death penalty law violated the Eighth Amendment.

[33] See App. D to Brief for Petitioner. Moreover, the last nontriggerman was executed in 1955. By contrast, 72 rapists were executed between 1955 and this Court's 1977 decision in *Coker*. Brief for Petitioner 34–35.

[34] See App. E to Brief for Petitioner; NAACP Legal Defense and Education Fund, Inc., Death Row U. S. A. (Oct. 20, 1981).

felony murder.   Consequently, we cannot know the fraction of cases in which juries rejected the death penalty for accomplice felony murder.   Moreover, as JUSTICE BLACKMUN pointed out in his concurring opinion in *Lockett v. Ohio*, 438 U. S., at 615, n. 2, many of these data classify defendants by whether they "personally committed a homicidal assault," and do not show the fraction of capital defendants who were shown to have an intent to kill.   While the petitioner relies on the fact that he did not pull the trigger, his principal argument is, and must be, that death is an unconstitutional penalty absent an intent to kill, for otherwise defendants who hire others to kill would escape the death penalty.   See n. 20, *supra*.   Thus, the data he presents are not entirely relevant. Even accepting the petitioner's facts as meaningful, they may only reflect that sentencers are especially cautious in imposing the death penalty, and reserve that punishment for those defendants who are sufficiently involved in the homicide, whether or not there was specific intent to kill.

Finally, as the petitioner acknowledges, the jury verdict statistics cannot be viewed in isolation from state death penalty legislation.   The petitioner and the Court therefore review recent legislation in order to support the conclusion that society has rejected capital felony murder.   Of the 35 States that presently have a death penalty, however, fully 31 authorize a sentencer to impose a death sentence for a death that occurs during the course of a robbery.[35]   The States are not uniform in delimiting the circumstances under which the

---

[35] Only Missouri, New Hampshire, and Pennsylvania define felony murder as a crime distinct from capital murder.   See Mo. Rev. Stat. §§ 565.001, 565.003, 565.008(2) (1978); N. H. Rev. Stat. Ann. §§ 630:1, 630:1–a(I)(b)(2), 630:1–a(III) (1974 and Supp. 1981); 18 Pa. Cons. Stat. §§ 2502(a), (b), (d), 1102(b) (1980).   One exception to the New Hampshire scheme is § 630:1(I)(b), which includes in the definition of capital murder a death caused "knowingly" in the course of a kidnaping.   A fourth State, Washington, permits imposition of the death penalty if premeditated murder is aggravated by, *inter alia*, commission during a felony.   Wash. Rev. Code §§ 9A.32.030(1)(a), 10.95.020(9) (1981).

death penalty may be imposed for felony murder, but each state statute can be classified as one of three types.  The first category, containing 20 statutes, includes those States that permit imposition of the death penalty for felony murder even though the defendant did not commit the homicidal act, and even though he had no actual intent to kill.[36]  Three addi-

---

[36] See Ariz. Rev. Stat. Ann. §§ 13–1105(A)(2), (C) (Supp. 1981–1982); Cal. Penal Code Ann. §§ 189, 190 (West Supp. 1982); Colo. Rev. Stat. §§ 18–3–102(1)(b), 18–1–105(1)(a) (1978 and Supp. 1981); Conn. Gen. Stat. Ann. §§ 53a–54b, 53a–54c, 53a–35a(1) (West Supp. 1982); Fla. Stat. §§ 782.04(1)(a), 775.082(1) (1981); Ga. Code §§ 26–1101(b), (c) (1978); Idaho Code §§ 18–4003(d), 4004 (1979); Ind. Code §§ 35–42–1–1(2), 35–50–2–3(b) (Supp. 1981); Miss. Code Ann. §§ 97–3–19(2)(e), 97–3–21 (Supp. 1981); Mont. Code Ann. §§ 45–5–102(1)(b), (2) (1981); Neb. Rev. Stat. §§ 28–303(2), 28–105(1) (1979); Nev. Rev. Stat. §§ 200.030(1)(b), 200.030(4)(a) (1981); N. M. Stat. Ann. §§ 30–2–1(A)(2), 31–18–14(A), 31–20A–5 (Supp. 1981); N. C. Gen. Stat. § 14–17 (1981); Okla. Stat., Tit. 21, §§ 701.7(B), 701.9(A) (1981); S. C. Code §§ 16–3–10, 16–3–20(C)(a)(1) (1976 and Supp. 1981); S. D. Codified Laws §§ 22–16–4, 22–16–12, 22–6–1(1), 22–3–3 (1979 and Supp. 1981); Tenn. Code Ann. §§ 39–2402(a), (b) (Supp. 1981); Vt. Stat. Ann., Tit. 13, §§ 2301, 2303(b), (c) (1974 and Supp. 1981); and Wyo. Stat. §§ 6–4–101(a), (b) (1977).

Two of these States, Colorado and Connecticut, provide that it is an affirmative defense to the capital crime if the accomplice did not "in any way solicit, request, command, importune, cause or aid the commission" of the homicidal act; was not armed with a deadly weapon and had no reason to believe that his cofelons were so armed; and did not engage or intend to engage, and had no reason to believe that his cofelons would engage, in conduct "likely to result in death or serious bodily injury."  See Colo. Rev. Stat. § 18–3–102 (2) (1978); Conn. Gen. Stat. § 53a–54c (Supp. 1982).  Colorado also prevents imposition of the death penalty if the defendant's role, though sufficient to establish guilt, was "relatively minor."  Colo. Rev. Stat. § 16–11–103(5)(d) (1978).  Even if they were available under the Florida statute, these provisions would have been of no help to the petitioner since the trial court found that there were no mitigating circumstances, in part because Enmund's role in the capital felony was not minor.  See Fla. Stat. § 921.141(6)(d) (1981).  The State Supreme Court expressly affirmed the trial court's finding of no mitigating circumstances, and therefore the finding that the petitioner's role was not minor.  399 So. 2d, at 1373.

Of course, not all of the statutes listed above are identical.  Several of them provide that robbery murder is a capital felony, but require proof of

tional States, while requiring some finding of intent, do not require the intent to kill that the petitioner believes is constitutionally mandated before the death sentence may be imposed.[37] The second category, containing seven statutes, includes those States that authorize the death penalty only if the defendant had the specific intent (or some rough equivalent) to kill the victim.[38] The third class of statutes, from

---

additional aggravating circumstances, e. g., the defendant had been convicted previously of a violent felony, or the victim was a correctional officer, before the death penalty can be imposed. See, e. g., Okla. Stat., Tit. 21, § 701.12 (1981); N. M. Stat. Ann. §§ 30-2-1(A)(2), 31-18-14(A), 31-20A-5 (Supp. 1981). Others, like the Florida statute, define robbery murder as a capital offense and use the robbery as an aggravating circumstance. The common thread in all of these statutes, however, is that the defendant need not have the intent to kill in order to be subject to the death penalty. The Court's additional subdivision of this group of statutes, see ante, at 791-793, and nn. 10-13, serves only to obscure the point that 20 States permit imposition of the death penalty even though the defendant did not actually kill, and had no intent to kill.

[37] See Ark. Stat. Ann. §§ 41-1501(1)(a), (2), (3) (1977) (a capital crime if death occurs during commission of the felony "under circumstances manifesting extreme indifference to the value of human life"); Del. Code Ann., Tit. 11, §§ 636(a)(6), 636(b), 4209(a) (1979) (a capital crime only if the death is caused "with criminal negligence"); Ky. Rev. Stat. § 507.020(1)(b), (2) (Supp. 1980) (defendant must "caus[e] the death of another person" under "circumstances manifesting extreme indifference to human life [and while] wantonly engag[ing] in conduct which creates a grave risk of death to another person"). It is an affirmative defense to capital felony murder in Arkansas if the "defendant did not commit the homicide act or in any way solicit, command, induce, procure, counsel, or aid its commission." Ark. Stat. Ann. § 41-1501(2) (1977).

At oral argument, counsel for petitioner stated that "the determining factor is the intent to take life, conscious purpose to take life." Tr. of Oral Arg. 18. Under the petitioner's proposed standard, these statutes would be unconstitutional.

[38] See Ala. Code §§ 13A-2-23, 13A-5-40(a)(2), (b), (c), (d), 13A-6-2(a)(1) (1977 and Supp. 1982) (the accomplice is not guilty of capital murder unless the killing is intentional, and the accomplice had "intent to promote or assist the commission" of the murder); Ill. Rev. Stat., ch. 38, ¶¶ 9-1(a)(3), 9-1(b)(6) (1979) (a capital crime only if the defendant killed intentionally or with knowledge that his actions "created a strong probability of death or

822

only three States, restricts application of the death penalty to those felony murderers who actually commit the homicide.[39]

The Court's curious method of counting the States that authorize imposition of the death penalty for felony murder cannot hide the fact that 23 States permit a sentencer to impose the death penalty even though the felony murderer has neither killed nor intended to kill his victim. While the Court acknowledges that eight state statutes follow the Florida death penalty scheme, see *ante*, at 789, n. 5, it also concedes that 15 other statutes permit imposition of the death penalty where the defendant neither intended to kill or actually killed the victims. See *ante*, at 790, n. 8 (Arkansas, Delaware, and Kentucky); *ante*, at 793–794, n. 15 (New Mexico); *ante*, at 791, n. 10 (Colorado); *ante*, at 791, n. 11 (Vermont); *ante*,

---

great bodily harm"); La. Rev. Stat. Ann. § 14.30(1) (West Supp. 1982) (defendant is guilty of capital murder only if he had "specific intent to kill or to inflict great bodily harm"); Ohio Rev. Code Ann. §§ 2903.01(B), (C), (D), 2929.02(A), 2929.04(A)(7) (1982) (accomplice is not guilty of the capital crime unless he "purposely cause[d]" the death and was "specifically found to have intended to cause the death of another"; if defendant is not the "principal offender," the death penalty is precluded unless he "committed the aggravated murder with prior calculation and design"); Tex. Penal Code Ann. §§ 12.31, 19.03(a)(2), 19.02(a)(1) (1974) (defendant is guilty of capital murder only if he "intentionally or knowingly" caused death during the course of the robbery); Utah Code Ann. §§ 76–5–202(1)(d), (2), 76–3–206(1) (1978) (defendant is guilty of capital murder only if he "intentionally or knowingly" caused the death during the course of the robbery); and Va. Code §§ 18.2–31(d), 18.2–10(a) (1982) (capital murder only if killing is "willful, deliberate and premeditated").

[39] See Ill. Rev. Stat., ch. 38, ¶¶ 9–1(a)(3), 9–1(b)(6) (1979) (a capital crime only if the defendant actually killed the victim and the defendant killed intentionally or with knowledge that his actions "created a strong probability of death or great bodily harm"); Md. Ann. Code, Art. 27, §§ 410, 412(b), 413(d)(10), (e)(1) (1982) (except in cases of murder for hire, only principal in the first degree subject to the death penalty); Va. Code §§ 18.2–31(d), 18.2–10(a), 18.2–18 (1982) (except in cases of murder for hire, only the immediate perpetrator of the homicide, and not accomplice before the fact or principal in the second degree, may be tried for capital murder). Note that Illinois and Virginia also require an intent to kill. See n. 38, *supra*.

at 792, n. 12 (Arizona, Connecticut, Indiana, Montana, Nebraska, and North Carolina); *ante*, at 792, n. 13 (Idaho, Oklahoma, and South Dakota). Not all of the statutes list the same aggravating circumstances. Nevertheless, the question before the Court is not whether a particular species of death penalty statute is unconstitutional, but whether a scheme that permits imposition of the death penalty, absent a finding that the defendant either killed or intended to kill the victims, is unconstitutional. In short, the Court's peculiar statutory analysis cannot withstand closer scrutiny.

Thus, in nearly half of the States, and in two-thirds of the States that permit the death penalty for murder, a defendant who neither killed the victim nor specifically intended that the victim die may be sentenced to death for his participation in the robbery-murder. Far from "weigh[ing] very heavily on the side of rejecting capital punishment as a suitable penalty for" felony murder, *Coker* v. *Georgia*, 443 U. S., at 596, these legislative judgments indicate that our "evolving standards of decency" still embrace capital punishment for this crime. For this reason, I conclude that the petitioner has failed to meet the standards in *Coker* and *Woodson* that the "two crucial indicators of evolving standards of decency . . . —jury determinations and legislative enactments—*both point conclusively* to the repudiation" of capital punishment for felony murder. 428 U. S., at 293 (emphasis added). In short, the death penalty for felony murder does not fall short of our national "standards of decency."

## C

As I noted earlier, the Eighth Amendment concept of proportionality involves more than merely a measurement of contemporary standards of decency. It requires in addition that the penalty imposed in a capital case be proportional to the harm caused and the defendant's blameworthiness. Critical to the holding in *Coker*, for example, was that "in terms of moral depravity and of the injury to the person and

to the public, [rape] does not compare with murder, which . . . involve[s] the unjustified taking of human life." 433 U. S., at 598.

Although the Court disingenuously seeks to characterize Enmund as only a "robber," *ante*, at 797, it cannot be disputed that he is responsible, along with Sampson and Jeanette Armstrong, for the murders of the Kerseys. There is no dispute that their lives were unjustifiably taken, and that the petitioner, as one who aided and abetted the armed robbery, is legally liable for their deaths.[40] Quite unlike the defendant in *Coker*, the petitioner cannot claim that the penalty imposed is "grossly out of proportion" to the harm for which he admittedly is at least partly responsible.

The Court's holding today is especially disturbing because it makes intent a matter of federal constitutional law, requiring this Court both to review highly subjective definitional problems customarily left to state criminal law and to develop an Eighth Amendment meaning of intent. As JUSTICE BLACKMUN pointed out in his concurring opinion in *Lockett*, the Court's holding substantially "interfere[s] with the States' individual statutory categories for assessing legal

---

[40] The Court's attempt to downplay the significance of Enmund's role in the murders, see *ante*, at 786–787, n. 2, does not square with the facts of this case. The trial court expressly found that because Enmund had planned the robbery, his role was not minor, and that therefore no statutory mitigating circumstances applied. The Florida Supreme Court affirmed the finding of no mitigating circumstances, thereby affirming the underlying factual predicate—Enmund had planned the armed robbery. Moreover, even Enmund's trial counsel conceded at the sentencing hearing that Enmund initiated the armed robbery and drove the getaway car. See n. 10, *supra*.

The Court misreads the opinion below in suggesting that the State Supreme Court deduced from the *sentencing hearing* that Enmund's only participation was as the getaway driver. In fact, the court made that statement with respect to the *guilt* phase of the trial. As I mentioned above, Enmund's counsel conceded at the sentencing hearing that Enmund had initiated the armed robbery.

guilt." 438 U. S., at 616.[41]  See also *id.*, at 635–636 (opinion of REHNQUIST, J.) (rejecting the idea that intent to kill must be proved before the State can impose the death penalty). Although the Court's opinion suggests that intent can be ascertained as if it were some historical fact, in fact it is a legal concept, not easily defined.  Thus, while proportionality requires a nexus between the punishment imposed and the defendant's blameworthiness, the Court fails to explain why the Eighth Amendment concept of proportionality requires rejection of standards of blameworthiness based on other levels of intent, such as, for example, the intent to commit an armed robbery coupled with the knowledge that armed robberies involve substantial risk of death or serious injury to other persons.  Moreover, the intent-to-kill requirement is crudely crafted; it fails to take into account the complex picture of the defendant's knowledge of his accomplice's intent and whether he was armed, the defendant's contribution to the planning and success of the crime, and the defendant's actual participation during the commission of the crime.  Under the circumstances, the determination of the degree of blameworthiness is best left to the sentencer, who can sift through the facts unique to each case.  Consequently, while the type of *mens rea* of the defendant must be considered carefully in assessing the proper penalty, it is not so critical a factor in determining blameworthiness as to require a finding of intent to kill in order to impose the death penalty for felony murder.

In sum, the petitioner and the Court have failed to show that contemporary standards, as reflected in both jury determinations and legislative enactments, preclude imposition of

---

[41] It is not true, as the petitioner suggests, that an intent-to-kill requirement would not interfere with the State's substantive categories of murder.  Prohibiting the death penalty for accomplice felony murder would create a category of murder between capital murder, for which the death penalty is permitted, and the next statutory degree, for which some term of years (typically less than life imprisonment) is imposed.

the death penalty for accomplice felony murder. Moreover, examination of the qualitative factors underlying the concept of proportionality do not show that the death penalty is disproportionate as applied to Earl Enmund. In contrast to the crime in *Coker*, the petitioner's crime involves the very type of harm that this Court has held justifies the death penalty. Finally, because of the unique and complex mixture of facts involving a defendant's actions, knowledge, motives, and participation during the commission of a felony murder, I believe that the factfinder is best able to assess the defendant's blameworthiness. Accordingly, I conclude that the death penalty is not disproportionate to the crime of felony murder, even though the defendant did not actually kill or intend to kill his victims.[42]

---

[42] The petitioner and the Court also contend that capital punishment for felony murder violates the Eighth Amendment because it "makes no measurable contribution to acceptable goals of punishment." *Coker* v. *Georgia*, 433 U. S., at 592. In brief, the petitioner and the Court reason that since he did not specifically intend to kill the Kerseys, since the probability of death during an armed robbery is so low, see ALI, Model Penal Code, *supra* n. 28, § 210.2, Comment, p. 38, n. 96 (concluding from several studies that a homicide occurs in about one-half of one percent of all robberies), and since the death penalty is so rarely imposed on nontriggermen, capital punishment could not have deterred him or anyone else from participating in the armed robbery. The petitioner and the Court also reject the notion that the goal of retribution might be served because his "moral guilt" is too insignificant.

At their core, these conclusions are legislative judgments regarding the efficacy of capital punishment as a tool in achieving retributive justice and deterring violent crime. Surely, neither the petitioner nor the Court has shown that capital punishment is ineffective as a deterrent for his crime; the most the Court can do is speculate as to its effect on other felony murderers and rely on "competent observers" rather than legislative judgments. See *ante*, at 799–800. Moreover, the decision of whether or not a particular punishment serves the admittedly legitimate goal of retribution seems uniquely suited to legislative resolution. Because an armed robber takes a serious risk that someone will die during the course of his crime, and because of the obviousness of that risk, we cannot conclude that the death penalty "makes no measurable contribution to acceptable goals of punishment."

## III

Although I conclude that the death penalty is not disproportionate to the crime of felony murder, I believe that, in light of the State Supreme Court's rejection of critical factual findings, our previous opinions require a remand for a new sentencing hearing.[43]  Repeatedly, this Court has emphasized that capital sentencing decisions must focus "on the circumstances of each individual homicide and individual defendant."  *Proffitt* v. *Florida*, 428 U. S. 242, 258 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.).  In striking down the mandatory capital punishment statute in *Woodson* v. *North Carolina*, 428 U. S., at 304, a plurality of the Court wrote:

> "A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind.  It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.
>
> ". . . [W]e believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."

In *Lockett* v. *Ohio*, 438 U. S., at 605, a plurality of this Court concluded:

> "Given that the imposition of death by public authority is so profoundly different from all other penalties, we can-

---

[43] Apparently, the Court also intends that the case be remanded for a new death sentence hearing, consistent, of course, with its holding today.

not avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases. . . . The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence" (footnote omitted).

Accordingly, "the sentencer, in all but the rarest kind of capital case, [may] not be precluded from considering, *as a mitigating factor*, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (footnotes omitted). *Id.*, at 604. See *id.*, at 613 (opinion of BLACKMUN, J.) (concluding that the Ohio capital sentencing statute is unconstitutional because it "provided the death sentence for a defendant who only aided and abetted a murder, without permitting any consideration by the sentencing authority of the extent of her involvement, or the degree of her *mens rea*, in the commission of the homicide"); *Green* v. *Georgia*, 442 U. S. 95, 97 (1979) *(per curiam)* (holding that the exclusion of evidence, from the capital sentencing proceeding, that the petitioner was not present when the victim was killed violated due process because "[t]he excluded testimony was highly relevant to a critical issue in the punishment phase of the trial"); *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982) (adopting the plurality's rule in *Lockett*). Thus, in deciding whether or not to impose capital punishment on a felony murderer, a sentencer must consider any relevant evidence or arguments that the death penalty is inappropriate for a particular defendant because of his relative lack of *mens rea* and his peripheral participation in the murder. Because of the peculiar circumstances of this case, I conclude that the trial court did not give sufficient consideration to the petitioner's role in the crimes, and thus did not consider the miti-

gating circumstances proffered by the defendant at his sentencing hearing.[44]

In sentencing the petitioner, the trial court found four statutory aggravating circumstances: the petitioner had been convicted previously of a violent felony; the murders had been committed during the course of a robbery; the murders had been committed for pecuniary gain; and the murders were especially heinous, atrocious, or cruel. In its factual findings, the trial court stated that the "armed robbery . . . was planned ahead of time by the defendant Enmund," App. 30, and that he had shot each of the victims while they lay prone in order to eliminate them as witnesses. *Id.*, at 30–31. The court expressly found that "*none* of the statutory mitigating circumstances applied" to the petitioner. *Id.*, at 32 (emphasis in original). Among other findings, the court rejected Enmund's claim that his participation in the murders had been "relatively minor," and found instead that "his participation in the capital felony was major. The defendant Enmund planned the capital felony and actively participated in an attempt to avoid detection by disposing of the murder weapons." *Ibid.*

The Florida Supreme Court rejected these findings in part. The court noted that there "was no direct evidence at trial that Earl Enmund was present at the back door of the Kersey home when the plan to rob the elderly couple led to their being murdered." 399 So. 2d, at 1370. Rather,

> "the only evidence of the degree of his participation is the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes. The jury could have concluded that he was there, a few hundred feet away, waiting to help the robbers escape with the Kerseys' money." *Ibid.*

---

[44] Although the petitioner challenges the constitutionality of his sentencing hearing, he does not challenge the constitutionality of the statutory capital sentencing procedures. See *Proffitt* v. *Florida*, 428 U. S. 242 (1976) (upholding the Florida scheme).

Consequently, the court expressly rejected the trial court's finding that Enmund personally had committed the homicides. Reviewing the aggravating circumstances, the Supreme Court consolidated two of them, and rejected the trial court's conclusion that the murders had been "heinous, atrocious, or cruel," since the evidence showed that the Armstrongs had killed the Kerseys in a gun battle arising from Mrs. Kersey's armed resistance, and not that the petitioner had killed them in an effort to eliminate them as witnesses. See *Armstrong* v. *State*, 399 So. 2d, at 963.

Although the state statutory procedures did not prevent the trial judge from considering any mitigating circumstances,[45] the trial judge's view of the facts, in part rejected by the State Supreme Court, effectively prevented such consideration. In his erroneous belief that the petitioner had shot both of the victims while they lay in a prone position in order to eliminate them as witnesses, the trial judge necessarily rejected the only argument offered in mitigation—that the petitioner's role in the capital felonies was minor, undeserving of the death penalty, because the petitioner was in the car when the fatal shots were fired. This fundamental misunderstanding of the petitioner's role in the crimes prevented the trial court from considering the "circumstances of the particular offense" in imposing sentence. *Woodson* v. *North Carolina*, 428 U. S., at 304. Moreover, this error was not so insignificant that we can be sure its effect on the

---

[45] See *Songer* v. *State*, 365 So. 2d 696, 700 (Fla. 1978) (holding that Fla. Stat. § 921.141(6) (1981), which lists mitigating circumstances, does not restrict the sentencer's consideration of mitigating circumstances to those expressly listed in the statute); *Shriner* v. *State*, 386 So. 2d 525, 533 (Fla. 1980), cert. denied, 449 U. S. 1103 (1981); 399 So. 2d, at 1371. As noted above, the petitioner offered no additional evidence at the sentencing hearing in mitigation of his crime. See Record 1677. His counsel argued, however, that the petitioner did not deserve the death penalty because his role in the crime was relatively minor. *Id.*, at 1683–1685.

sentencing judge's decision was negligible.[46]   Accordingly, I would vacate the decision below insofar as it affirms the death sentence, and remand the case for a new sentencing hearing.

---

[46] The Florida Supreme Court's opinion fails to correct this error either by remanding for new sentencing or by evaluating the impact of the trial court's fundamental misperception of the petitioner's role in the killings. Rather, the court simply repeats three times, without any discussion of the evidence, that there are "no mitigating circumstances."   399 So. 2d, at 1373.   In light of the court's dramatically different factual findings, this review is inadequate to satisfy the *Lockett* principle.