Filed 8/29/24  P. v. Vo CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KHUONG QUOC VO,<br><br>    Defendant and Appellant. | G062694<br><br>(Super. Ct. No. 93WF0571)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Terri K. Flynn-Peister, Judge. Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

Thirty years ago, appellant Khuong Quoc Vo was sentenced to prison for an indeterminate life term after a jury found him guilty of special circumstances felony murder. In this appeal, he challenges the denial of his petition for resentencing following an evidentiary hearing under Penal Code section 1172.6.[1] Appellant contends reversal is required because there is insufficient evidence to support the trial court's findings that he was a major participant in the underlying felony and that he acted with reckless indifference to human life. We disagree and find there is substantial evidence to sustain the court's findings in that regard. We thus affirm its denial order.

FACTUAL AND PROCEDURAL BACKGROUND

Early one morning in 1993, while armed with knives, appellant, Duc T. and Tung N. went to a motel room where Tuan T. was hanging out with three other people.[2] During the encounter, appellant beat Tuan and a robbery occurred. Duc also stabbed Tuan in the leg. Although Duc did not act with what the law regards as malicious intent, his knife severed Tuan's femoral artery, and he bled to death at the scene.

Appellant, Duc and Tung were charged with first degree murder and robbery. (§§ 187, subd. (a), 211.) It was also alleged as special circumstances that the murder occurred during the commission of a burglary and a robbery. (§ 190.2, subds. (a)(17)(i) & (vii).) Following the prosecution's

---

[1] That section was originally housed in Penal Code section 1170.95, but it was subsequently renumbered without substantive change as Penal Code section 1172.6. (Stats. 2022, ch. 58, § 10.) For ease of reference, we will refer to the current provision. All further statutory references are to the Penal Code.

[2] Because many of the people involved in this case have the same last names, we will refer to them by their first name to facilitate clarity. No disrespect is intended.

case-in-chief, defendants moved to dismiss the special circumstances allegations for lack of evidence. (§ 1118.1.) The trial court gathered from the prosecution's evidence that defendants entered Tuan's motel room to beat him up, not to commit robbery. Therefore, it dismissed the burglary-murder allegation, which required proof of larcenous intent upon entry.

However, the trial court found that once defendants were inside the room, they committed a robbery during which Tuan was killed. It thus allowed the robbery-murder allegation to go to the jury. Ultimately, the jury found that allegation true as part of its finding that defendants committed first degree murder. It also convicted defendants of four counts of robbery and found they used a knife during the commission of that offense.

At sentencing, appellant moved to strike the special circumstances finding on Eighth Amendment grounds. In granting the motion, the trial court found it significant that appellant was only 19 years old at the time of his crimes. In light of appellant's age and the circumstances surrounding Tuan's murder, the trial court sentenced appellant to 25 years to life in prison, instead of life without parole, for that offense. (See generally *People v. Dillon* (1983) 34 Cal.3d 441 [trial courts are empowered to reduce a defendant's sentence if imposing the prescribed term would constitute cruel and unusual punishment].) We affirmed the judgment on direct appeal. (*People v. Vo et al.* (July 19, 1995, G015257) [nonpub. opn.].)

After appellant petitioned for resentencing in 2020, the trial court issued an order to show cause and conducted an evidentiary hearing pursuant to section 1172.6, subdivisions (c) and (d). At the hearing, the court relied on the record transcript of appellant's underlying trial, which contains the following facts:

3

There were two groups of people involved in this case. One group consisted of appellant, Duc and Tung and a man named Dung N. And the other group consisted of Tuan, Hiep H., Nhan T. and Kim T. Although appellant had worked with Hiep and Nhan in the past, he was not on good terms with them when this case arose. Appellant's relationship with Tuan was also strained. Their ill feelings toward one another were evidenced in a series of telephone conversations that occurred on April 13, 1993, starting at about 1:30 in the morning.

At that time, Tuan and his companions were at a small motel room in Garden Grove, and appellant's group was at a nearby apartment. During one of the phone calls, Duc argued with Tuan before handing the phone over to appellant. Tuan accused appellant of interfering with his drug business and said that if he wanted to, he could have appellant killed for a mere 25 cents. This angered appellant. He threatened to go over to Tuan's room and hurt him, but Tuan doubted appellant's resolve, calling him "chicken" and accusing him of being all talk and no action.

That was an unfortunate assessment. Within about 15 minutes, appellant and his companions arrived at Tuan's motel armed with knives. Dung knocked on Tuan's motel room door, and when it opened, appellant, Duc and Tung burst into the room with their knives out and at the ready. Dung stayed outside and was not involved in the ensuing confrontation, which pitted appellant and his two cohorts against Tuan, Hiep, Nhan and Kim.

Appellant put his knife up to Tuan's neck and threatened to stab him if he moved. Then he pushed Tuan onto the bed, straddled his chest and began punching him in the head, not far from where Kim was sitting. During the beating, appellant was initially holding his knife in one hand and

4

punching Tuan with his other hand. Then he put the knife down on the bed and pummeled Tuan with both his hands.

In the course of the attack, appellant nicked Tuan on the face, ear, neck and shoulder with the blade of his knife. He also told Tuan that, unlike "the old Vo" in the past, he was now tough and mean and unwilling to put up with any disrespect. And instead of just making idle threats, he was going to follow up his words with actions.

While appellant was attacking Tuan, Tung confronted Hiep and held a knife up to his neck by the window. Then he pushed Hiep to the floor, snatched the necklaces from his neck, and took up a lookout position by the window.

Duc was also busy. Upon entering the room, he ripped the telephone cord out of the wall and turned off the lights, leaving the glow of the television as the only light in the room. Then, with knife in hand, he ordered Nhan to sit on the floor and began rummaging through the room for valuables. As he was doing so, he told Nhan, Hiep and Kim that he would kill them if they did not hand over their watches and jewelry to him quickly and quietly. After Hiep and Nhan surrendered their possessions, Duc kicked and punched them, but he did not harm Kim when she turned over her jewelry.

Duc also opened Tuan's wallet, which was lying on the bed next to where appellant was beating him. However, appellant said he had already looked through the wallet, so Duc put it back down. Duc wasn't finished, though. About 10 minutes into the ordeal, while appellant was still straddling and punching Tuan, Duc took his knife and plunged it into Tuan's thigh.

Appellant did not realize Tuan had been stabbed until he felt blood pouring out of his leg. At that point, he gave Tuan one more "heavy

blow" to the face. Then he got off Tuan, kneed Hiep and Nhan in the head, and asked Duc, "Why did you stab him?" Duc said he wanted to gain respect and to give Tuan a scar to remember for the rest of his life.

Appellant and Duc ripped up a towel with their knives, but they made no attempt to assist Tuan. Instead, their thoughts turned to escaping. They would have left the room then but there was a police car outside, so they stayed there for about 10 more minutes before departing.

After they left, Kim wrapped a sheet around Tuan's leg and called 911, but Tuan was not breathing at that time. He suffered a deep laceration that severed his femoral artery, and he was already dead from the loss of blood by the time the police arrived. The nature of his injury was such that without medical attention he could not have survived for more than 10 minutes after the stabbing. When the police examined him at the scene, they noticed his watch and ring were still on. And when they looked in his wallet, they discovered it contained slightly over $500 in cash.

Appellant and his cohorts were stopped and arrested as they were driving away from the motel. A search of their vehicle turned up three knives, and later on at the police station, the police found the victims' jewelry in Duc's possession.

While appellant and Duc were in custody, the police surreptitiously recorded them talking about the incident. Appellant told Duc they would have been wealthy if they had gotten away with the victims' jewelry, but regardless of the way things had turned out, they would still "go on robbing." Appellant and Duc also laughed about the injuries they inflicted on Tuan, as if his suffering was a joke. They both expressed the belief Tuan would have survived if they had bandaged his wound after the stabbing. However, appellant also remarked that he had beaten Tuan so savagely with

6

his fists that even if he had managed to survive, "he would have been mentally ill."

At trial, appellant testified that during his phone call with Tuan on the night in question, Tuan ridiculed and threatened to kill him. So, he armed himself with a knife and asked Duc and the others to accompany him to Tuan's motel room. According to appellant, he just wanted to settle the score with Tuan; there was no talk about robbing anyone or stealing anything. In fact, appellant insisted the only reason he brought Duc and Tung along was so that they could keep Tuan's friends from interfering with the beating he intended to inflict on Tuan.

However, on cross-examination, appellant acknowledged that he nodded affirmatively during his post-arrest interview when the police asked him if he had heard his cohorts talking about getting money from the victims before entering their motel room. Appellant also admitted nodding when asked if he knew that getting money was part of the reason that Duc and Tung accompanied him to the room.

During his police interview, appellant further admitted that he had ripped a necklace off Tuan while he was beating him on the bed. And although he contended the stabbing took him by surprise, he conceded that prior to entering Tuan's motel room, Duc had told him that he wanted to stab Tuan.[3]

---

[3] When appellant was first asked about this aspect of his interview on cross-examination, he denied telling the police that is what Duc said he wanted to do. However, later in his testimony, appellant admitted Duc had told him he wanted to stab Tuan. Appellant said that was Duc's way of letting him know he would have his back during the confrontation with Tuan.

In addition to all this evidence, the trial court heard testimony from defense witness Elizabeth Cauffman at the evidentiary hearing. Cauffman is an expert on adolescent brain development. She testified that for most people, their brain does not become fully developed until the mid-20s or early 30s. Prior to that age, people tend to lack impulse control and emotional insight. They are also susceptible to peer pressure and prone to risky, impetuous behavior. However, Cauffman admitted that every person is different in terms of their cognitive development and that she could not speak to appellant's maturity at the time of his offenses.

Based on all these facts, the trial court was convinced beyond a reasonable doubt that, for purposes of the current felony murder rule, appellant was a major participant in the underlying robbery, and he acted with reckless indifference to human life. In reaching this conclusion, the court determined appellant was the driving force behind the violent confrontation that led to the Tuan's death. The court also found appellant's degree of involvement in the robbery was greater than that of an ordinary aider and abettor, and his age did not preclude him from understanding the grave risks associated with his dangerous behavior. Therefore, the court denied his petition for resentencing.

DISCUSSION

Appellant contends there is insufficient evidence to support the trial court's decision to deny his petition. We disagree.

Appellant's claim for resentencing is grounded in Senate Bill No. 1437 (Senate Bill 1437), which narrowed the scope of vicarious liability for the crime of murder in California. As relevant here, Senate Bill 1437 restricted the felony murder rule so that it can only be applied in limited situations, such as when—as alleged in this case—the defendant was a major

8

participant in the underlying felony and acted with reckless indifference to human life. (§ 189, subd. (e)(3).)

To obtain relief under the statute, the defendant must first show he was convicted of murder based on a theory of imputed liability, and he would not be liable for murder under current law. (§ 1172.6. subd. (a).) If the defendant makes a prima facie showing to that effect, the trial court is required to issue an order to show cause and conduct an evidentiary hearing. (*Id.*, subds. (c), (d).) At the hearing, the prosecution must prove beyond a reasonable doubt that the defendant's conduct did in fact rise to the level of murder as redefined by Senate Bill 1437. (*Ibid.*) Otherwise, the defendant is entitled to vacatur and resentencing pursuant to the terms of section 1172.6.

When, as here, the trial court denies a resentencing petition following an evidentiary hearing, we review the court's ruling under the substantial evidence standard. (*People v. Reyes* (2023) 14 Cal.5th 981, 988; *People v. Njoku* (2023) 95 Cal.App.5th 27, 41-43.) Under that standard, "'we review the evidence in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [trial judge] could reasonably have deduced from the evidence. [Citation.] "Conflicts [in the evidence] . . . subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge . . . to determine the . . . truth or falsity of the facts upon which a determination depends. [Citation.]'" [Citation.]" (*People v. Williams* (2020) 57 Cal.App.5th 652, 663.) "Although we must ensure the evidence is reasonable, credible, and of solid value" (*People v. Jones* (1990) 51 Cal.3d 294, 314), reversal is not warranted unless ""'upon no hypothesis whatever is there sufficient substantial evidence to support [the trial court's ruling].'" [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

Assessing the record from that deferential perspective, we are convinced there is substantial evidence to support the trial court's finding that appellant was a major participant in a felony and acted with reckless indifference to human life. Our analysis is guided by the judicial interpretation of those statutory requirements.

The major participant and reckless indifference requirements stem from a pair of United States Supreme Court cases, *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*). In those decisions, the high court considered under what circumstances the death penalty could be imposed on a person "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund, supra*, 458 U.S. at p. 797.)

Earl Enmund was just such a person. After hatching a robbery plot, he drove his cohorts to the victim's house and waited nearby while they confronted the victim at gunpoint. When the victim's wife appeared with a gun of her own, they shot and killed her, as well as the intended victim. Enmund then drove them from the scene and helped them get rid of their guns. Focusing on Enmund's conduct and culpability, the United States Supreme Court determined that because he played a minor role in the robbery and lacked the intent to kill, he could not be subjected to the death penalty, even though the victims were murdered during the course of a serious felony—armed robbery—that he planned and facilitated. (*Enmund, supra*, 458 U.S. at pp. 798-801.)

In *Tison*, the defendants' conduct was more egregious, although, like Enmund, they harbored no murderous intent. The defendants in *Tison* were two brothers who sprang their father Gary and another convicted

10

murderer, Randy, from prison during an armed confrontation with guards. Following the breakout, the group flagged down a car, captured its occupants at gunpoint and took their belongings. Then Gary and Randy shot and killed them while the defendants looked on from a distance. The group evaded authorities for several days but was eventually apprehended after a shootout with the police. The question presented was whether the defendants— nonkillers who lacked the intent to kill but were heavily involved in the armed breakout and kidnapping for robbery—could lawfully be put to death for the murders committed by Randy and their father.

The high court answered that question in the affirmative, explaining the defendants' "own personal involvement in the crimes was not minor, but rather, as specifically found by the trial court, 'substantial.' Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery [a la Enmund], each [defendant] was actively involved in every element of the kidnaping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the [victims] and the subsequent flight." (*Tison, supra,* 481 U.S. at p. 158.) Equally important, the facts demonstrated the defendants "subjectively appreciated that their acts were likely to result in the taking of innocent life." (*Id.* at p. 152.) The court found their "reckless indifference to the value of human life [was] every bit as shocking to the moral sense as an 'intent to kill.'" (*Id.* at p. 157.)

In the wake of *Tison*, California voters passed Proposition 115, which amended the felony murder rule to prohibit imposition of the death penalty for nonkillers who lacked the intent to kill unless they were "a major participant" in a qualifying felony and acted "with reckless indifference to human life." (§ 190.2, subd. (d).) By finding appellant guilty of special

11

circumstances felony murder in 1993, appellant's jury necessarily determined he met those criteria.

However, it was not until several years later, in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), that the California Supreme Court fully examined the meaning of the terms "major participant" and "reckless indifference" in order to "clarify" and provide "a deeper understanding" of how they should be applied in a given case. (*Banks, supra*, 61 Cal.4th at p. 801; *In re Taylor* (2019) 34 Cal.App.5th 543, 546.) Therefore, the jury's true finding on the special circumstance felony murder allegation is not dispositive of appellant's right to resentencing. (*People v. Strong* (2022) 13 Cal.5th 698, 703.) Rather, we must assess his eligibility in light of how *Banks* and *Clark* interpreted the major participation and reckless indifference requirements. (*Ibid*.)

The facts in *Banks* were akin to those in *Enmund* in that the defendant served as the getaway driver for an armed robbery in which his confederate shot and killed a person who resisted the robbery. In examining the parameters of the major participation requirement, the *Banks* court explained, "*Tison* and *Enmund* establish that a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund. The defendants' actions in *Tison* [] and *Enmund* [] represent points on a continuum. [Citation.] Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility." (*Banks, supra*, 61 Cal.4th at p. 802.)

The *Banks* court then articulated several factors bearing on the major participation requirement: "What role did the defendant have in

12

planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803.) The court stated, "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation . . . was sufficiently significant to be considered 'major' [citations]." (*Ibid*.)

Applying these factors to the defendant's actions in *Banks*, the Supreme Court found his conduct failed to satisfy the major participant requirement because he was not involved in planning the robbery, he did not procure weapons for the shooter, neither he nor the other participants had any history of violent crime, he was not present at the scene of the shooting, and there was "no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Banks, supra*, 61 Cal.4th at p. 805.)

The *Banks* court also addressed the mens rea requirement for the felony murder special circumstance. While acknowledging there is an inherent risk of death in all armed robberies, the court stated that risk alone is not enough to support a finding of reckless indifference. Rather, the evidence must establish the defendant engaged in conduct that is "'"known to carry a grave risk of death."'" [Citations.]" (*Banks, supra*, 61 Cal.4th at p. 801.) The Supreme Court found that standard was not met in *Banks* because,

13

unlike the situation in *Tison*, there was no evidence the defendant "knowingly conspired with accomplices known to have killed before. Instead, as in *Enmund*, [the fatal shooting] was apparently a spontaneous response to armed resistance from the victim." (*Id.* at p. 807.)

In *Clark*, the Supreme Court further elaborated on the reckless indifference requirement. Clark planned and organized the closing-time robbery of an Orange County computer store and was orchestrating events from his car in the parking lot when the mother of one of the victims unexpectedly entered the store. An accomplice in the store promptly shot her dead, leading to Clark's conviction for special circumstances felony murder. Without deciding whether Clark was a major participant in the underlying robbery, the Supreme Court noted there is significant overlap between the major participant requirement and the reckless indifference requirement, "'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' [Citation.]" (*Clark, supra*, 63 Cal.4th at p. 615.)

This overlap was further elucidated when the court announced the factors it considered pertinent to the reckless indifference analysis, namely, "the defendant's knowledge of weapons, and the use and number of weapons; the defendant's proximity to the crime and opportunity to stop the killing or aid the victim; the duration of the offense conduct, that is, 'whether a murder came at the end of a prolonged period of restraint of the victims by defendant'; the defendant's awareness his or her confederate was likely to kill; and the defendant's efforts to minimize the possibility of violence during the crime." (*In re Miller* (2017) 14 Cal.App.5th 960, 973, quoting *Clark, supra*, 63 Cal.4th at pp. 618-623.) As it did in enunciating the major participant factors in *Banks*, the Supreme Court in *Clark* made it clear that none of these

14

factors was necessary, or necessarily sufficient, to satisfy the reckless indifference requirement in a given case. (*Clark, supra*, 63 Cal.4th at p. 618.)

However, on balance, the Supreme Court felt those factors militated against a finding Clark acted with reckless indifference in his case. As to that issue, the court found it significant the sole gun used in the robbery held a single bullet and was carried by an accomplice, not Clark. (*Clark, supra*, 63 Cal.4th at p. 619.) In addition, although Clark was nearby at the time of the shooting, he was not physically present at the scene, rendering him unable to prevent it. (*Ibid.*) Furthermore, there was no evidence Clark ordered the shooting or wanted it to occur. (*Id.* at pp. 619-621.) In fact, the evidence suggested just the opposite, in that Clark planned the robbery to take place after the store was closed, and he thought the gun was unloaded. (*Ibid.*) The Supreme Court determined those circumstances warranted reversal of the special circumstance findings because, at bottom, there was nothing about the planning and nature of the robbery "that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id.* at p. 623.)

"Since *Clark*, courts have discerned an additional factor that may be relevant to the reckless indifference analysis – the defendant's youth." (*People v. Keel* (2022) 84 Cal.App.5th 546, 558.) Indeed, it is now well recognized that minors and young adults are generally less responsible than older adults because they typically lack the experience and judgment to recognize and avoid situations that could be harmful to themselves and others. (*Ibid.*) Therefore, along with all of the other attendant circumstances, the defendant's youthfulness must be considered when determining whether he acted recklessly indifferent to the victim's life. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 487-488.)

15

Turning first to the major participant requirement, it is important to keep in mind that while this prong of the felony murder rule focuses on the defendant's involvement in the underlying felony, it encompasses a broad range of factors. So, in addition to examining appellant's actions viz-a-viz the robbery in this case, we must also consider his involvement in the events leading up to Tuan's death, his subjective awareness of the dangers presented, whether his actions facilitated the killing, and what he did after Tuan was stabbed. (*Banks, supra*, 61 Cal.4th at p. 803.)

In that regard, the record supports the trial court's finding that appellant was the driving force behind the deadly encounter with Tuan. After arguing with and threatening Tuan on the phone, appellant recruited Duc and Tung to accompany him to Tuan's motel room. All three of them had knives by the time they entered the room. And like appellant, Duc had also argued with Tuan on the phone that night. Thus, it would have been readily apparent to appellant that the stage was set for a violent and potentially deadly confrontation.

Although appellant testified that he did not expect the confrontation to extend beyond his fight with Tuan, he admitted to the police that he had heard his cohorts talking about getting money from the victims before entering their motel room, and that was a factor in the decision to have Duc and Tung go with him to the room. Duc had also mentioned to appellant that he was prepared to stab Tuan during the encounter. Indeed, Duc told appellant that he would be happy to stab Tuan if appellant needed protection. Therefore, while appellant's main objective may have been to beat Tuan, he had good reason to suspect that other violent crimes might unfold during the confrontation.

16

And that is precisely what happened when appellant's group entered the victims' motel room. After Duc turned out the lights, he and Tung promptly robbed Hiep, Nhan and Kim at knifepoint. In the process, Duc not only threatened to kill the victims, but he also hit and kicked Hiep and Nhan *after* they surrendered their jewelry. This signaled that Duc was not going to be content with just pulling off a robbery. And even though appellant was busy beating Tuan at that time, it is reasonable to infer he knew that Duc was in the midst of a life-threatening rampage. After all, the room was rather small, and Duc made no secret of his hostile intentions.

Appellant's own actions were also exceedingly dangerous. Upon entering the motel room, he immediately confronted Tuan with his knife. While holding the weapon up to Tuan's neck, he threatened to stab Tuan if he so much as moved. He also nicked Tuan with his knife on the shoulder, neck, face and ear as he was straddling and pounding him on the bed. Given the chaos unfolding in the room, appellant's conduct created a high likelihood of death. One false move by either him or Tuan could easily have resulted in a fatality, even before the stabbing occurred.

But appellant did not just nick up, beat, and threaten to kill Tuan. The evidence indicates he also yanked off Tuan's necklace and rifled his wallet. So, even if appellant was somehow oblivious to the fact Duc was robbing Hiep, Nhan and Kim right there next to him, he was fully engaged in the robbery himself. His actions also immobilized Tuan such that Tuan was highly vulnerable to Duc's deadly knife attack. Thus, in terms of sheer egregiousness, appellant's conduct was much closer to the defendants in *Tison* than the defendant in *Enmund*.

Appellant testified he was surprised by the attack, but once he realized Tuan was bleeding abundantly from being stabbed, he did not try to

17

help him. Instead, he punched Tuan hard in the face one more time for good measure. Then he kneed Hiep and Nhan in the head before asking Duc—somewhat offhandedly—why he stabbed Tuan. Although appellant may have been taken unaware by the stabbing, his reaction to it was callous and uncaring. At no point did he try to render aid to Tuan, even though, as he later admitted to Duc, he probably could have saved Tuan's life by doing so.

Despite his deep, personal involvement in the events leading up to the stabbing, appellant argues he was not a major participant in the underlying robbery. In so arguing, appellant contends that both the judge in his underlying trial, and the judge at his resentencing hearing, found that his intent in going to the victims' motel room was simply to fight Tuan, not to rob anyone. However, in reducing appellant's sentence from life without parole to 25 years to life in prison, the sentencing judge determined appellant harbored "dual intent[s]" on the night in question. While acknowledging appellant's primary intent was to confront and attack Tuan, the judge was convinced appellant also had the intent to rob.

Moreover, at appellant's resentencing hearing, the trial court found that even if appellant was not part of the robbery scheme from the get-go, it would have been obvious to him soon after entering Tuan's motel room that Duc was bent on committing a very violent robbery. So, by continuing to beat Tuan, appellant became "part and parcel" of the robbery; his actions kept Tuan at bay while Duc collected the victims' belongings.

The trial court also found that the robbery fit well within appellant's plan to attack Tuan. As the trial judge put it, "The robbery was part of the confrontation[,] of the disrespect. I think [appellant] and his co-defendants were . . . going to do whatever they needed to do to show that Vo

18

was not the old Vo, that he was not going to take the threats and the disrespect without answering with violence."

The record amply supports this assessment. Given everything appellant knew and did during the encounter, we cannot quarrel with the trial court's rejection of his attempt to distance himself from the robbery is simply unpersuasive. There is substantial evidence to support the trial court's finding he was a major participant in that offense.

For largely the same reasons, we uphold the trial court's finding that appellant acted with reckless indifference to human life. To satisfy that requirement, "'The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create.' [Citation.]" (*In re Bennett* (2018) 26 Cal.App.5th 1002, 1021.) As illustrated by the *Enmund* decision, this mental state rarely exists in a defendant who plays a minor role in a garden-variety armed robbery, especially if he or she was not personally armed or physically present at the scene of the killing. (*Enmund, supra*, 458 U.S. at pp. 798-801 [getaway driver did not act recklessly indifferent to the victims who were killed during a robbery that he helped plan]; accord, *In re Bennett, supra*, 26 Cal.App.5th at pp. 1025-1026 [overturning reckless indifference finding where the defendant helped plan the robbery but was not present at the murder scene].)

But if the defendant actively participated in the underlying robbery while armed with a deadly weapon and his conduct led to the victim's death, it may be entirely reasonable to infer he acted recklessly indifferent to human life. (*People v. Bascomb* (2020) 55 Cal.App.5th 1077.) This is true even if the defendant did not actually kill the victim or specifically intend for him to die. (*In re Miller, supra*, 14 Cal.App.5th at p. 969.) Therefore, it is not

19

dispositive here that Duc was the person who killed Tuan and that appellant did not intend for Tuan to die.

However, for purposes of assessing appellant's culpability, it *is* relevant that he was personally armed, and that he knew his cohorts had knives, when they entered the victims' motel room. (*Clark, supra*, 63 Cal.4th at p. 618.) How they used their knives is also important. (*Ibid*.) As to that issue, the record shows Tung immediately neutralized Hiep at the window with his knife, Duc brandished his knife while robbing the victims and threatening to kill them, and appellant told Tuan that he was going to stab him if he resisted in any way. Appellant then proceeded to nick up Tuan with his knife before pummeling him with his fists. The number of knives involved and the way they were used created an extremely dangerous situation inside the room.

Appellant testified he was so busy beating Tuan that he did not see Duc plunge his knife into Tuan's leg. But appellant also admitted that Duc had expressed his willingness to stab Tuan before they entered the motel room. By beating and restraining Tuan for so long, appellant made Tuan particularly susceptible to Duc's knife attack. The fact the attack occurred after a substantial period of violence and restraint supports the conclusion of the trial court that appellant was recklessly indifferent to human life. (*Clark, supra*, 63 Cal.4th at pp. 620-621.)

So do other circumstances. Even after the stabbing occurred, and after he felt blood pouring out of Tuan's leg, appellant showed no regard for Tuan's life. In fact, instead of trying to help Tuan, appellant continued to attack him. Appellant argues his failure to assist Tuan is immaterial because there was nothing he could have done to save Tuan anyway. In so arguing, he relies on the medical evidence indicating that Tuan could not have survived

longer than 10 minutes after the stabbing. However, that time estimate reflected Tuan's prospects "without medical attention." And, as it turned out, 10 minutes is the amount of time that appellant and his cohorts lingered in the motel room after the stabbing so Tuan may well have been dead when they left. But rather than rendering aid to Tuan, they were more concerned about avoiding apprehension. Appellant's failure to make *any* effort to assist Tuan is another sign that he was recklessly indifferent to human life. (*Clark, supra*, 63 Cal.4th at p. 619.) The issue here is not whether Tuan could have been saved, but whether appellant's conduct evinced recklessness. The trial court thought it did, and we find substantial evidence supporting that conclusion.

We recognize that appellant was only 19 years old at the time of his crimes and that young adults are more prone to impulsive behavior than their elders. Appellant clearly acted immaturely and impetuously, when in response to Tuan's taunting telephone remarks, he rushed over to Tuan's motel room to beat him up. Appellant's adolescent behavior was also on full display when he and Duc laughed about Tuan's death while they were talking at the police station following their arrest.

However, during that same conversation, appellant also acknowledged that Tuan probably would have survived if he had helped him out after the stabbing. Along with all of the other circumstances presented, this indicates appellant was aware of the life threatening situation that he and his cohorts had created. (See generally *People v. Mitchell* (2022) 81 Cal.App.5th 575, 595 ["The fact of youth cannot overwhelm all other factors" in the reckless indifference analysis].)

While "[y]outh can distort risk calculations" (*People v. Mitchell, supra*, 81 Cal.App.5th at p. 595), appellant was a full-fledged adult in the

21

eyes of the law at the time of his offenses. This is not a case where an extremely young defendant got caught up in deadly events that he neither anticipated nor could have reasonably foreseen. (Compare *People v. Keel, supra,* 84 Cal.App.5th at pp. 560-562 [reversing reckless indifference finding absent evidence the subject robbery was planned or the 15-year-old defendant had any idea it would actually take place]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 991-992 [15-year-old defendant lacked the experience and maturity to appreciate the grave risks associated with his criminal actions]; *In re Moore* (2021) 68 Cal.App.5th 434, 451-455 [holding similarly in the case of a 16-year-old defendant].)

For all these reasons, we conclude there is sufficient evidence to support the trial court's finding that appellant acted in a manner that was recklessly indifferent to human life. Although the evidence of appellant's culpability is not overwhelming in nature, we see no basis to disturb the trial court's findings under the deferential standard of review applicable in this case. Because the record contains substantial evidence that appellant committed felony murder for purposes of the current felony murder rule, the trial court properly denied his petition for resentencing.

## DISPOSITION

The trial court's order denying appellant's petition for resentencing is affirmed.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


DELANEY, J.